08:18:58   1          IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
           2                   DALLAS DIVISION

           3   AMERICAN INSTITUTE OF PHYSICS (  CIVIL ACTION NUMBER
               and BLACKWELL PUBLISHING, LTD.(
           4                                  (
                           Plaintiff,         (
           5                                  (  3:12-CV-1230-M
               VERSUS                         (
           6                                  (
               WINSTEAD PC and JOHN DOES 1-10(
           7                                  (
                           Defendants,        (
08:18:58   8                                  (
               UNITED STATES PATENT &         (  May 22, 2013
           9   TRADEMARK OFFICE,             (
                                              (
          10        Intervenor Defendant.  (  9:15 a.m.

          11

          12            TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE BARBARA M.G. LYNN
          13            UNITED STATES DISTRICT JUDGE

          14   A P P E A R A N C E S:
               FOR THE PLAINTIFF:
          15
                                        WILLIAM DUNNEGAN
          16                            DUNNEGAN & SCILEPPI LLC
                                        350 Fifth Avenue
          17                            Suite 4908
                                        New York, New York 10118
          18                               212.332.8303
                                        wd@dunnegan.com
          19
                                        JAMES E. DAVIS
          20                            KLEMCHUK KUBASTA LLP
                                        8150 North Central Expressway
          21                            Campbell Centre II
                                        Suite 1000
          22                            Dallas, Texas 75206
                                           214.367.6000
          23                            jim.davis@kk-llp.com

          24

          25

```
08:18:58   1
           2    FOR THE DEFENDANT:
                WINSTEAD PC
           3    JOHN DOES #1-10                GEORGE M. KRYDER
                                               VINSON & ELKINS
           4                                   Trammel Crow Center
                                               2001 Ross Avenue
           5                                   Suite 3700
                                               Dallas, Texas 75201-2975
           6                                        214.220.7700
                                               gkryder@velaw.com
           7
                PATENT & TRADEMARK
08:18:58   8    OFFICE                         THOMAS L. CASAGRANDE
                                               ASSOCIATE SOLICITORS
           9                                   UNITED STATES PATENT &
                                                  TRADEMARK OFFICE
          10                                   Madison Building East
                                               Room 10B20
          11                                   600 Dulany Street
                                               Alexandria, Virginia 22314
          12
          13                                   TAMI C. PARKER
                                               ASSISTANT U.S. ATTORNEY
          14                                   DEPUTY CIVIL CHIEF
                                               DALLAS DIVISION
          15                                   Earle Cabell Federal Building
                                               1100 Commerce Street
          16                                   Suite 300
                                               Dallas, Texas 75242-1699
          17                                        214.659.8600
                                               Tami.Parker@usdoj.gov
          18
          19
                COURT REPORTER:                P. SUE ENGLEDOW RPR/CSR NO. 1170
          20                                   1100 Commerce Street, Room 1572
                                               Dallas, Texas 75242
          21                                        214.753.2325
                                               p.sue@att.net
          22
                Proceedings reported by mechanical stenography, transcript
          23    produced by computer.
          24
          25
```

**P R O C E E D I N G S**
May 22, 2013
9:15 a.m.
MOTIONS HEARING

08:18:58 1

2

3

4          (Judge enters the courtroom.)

5          (Court opening.)

6               THE COURT:  Good morning.  Give me just one second.

7     I'm looking for something.  I don't think I have that here.

8          All right.  Thank you.  The Court has scheduled oral

9     argument in American Institute of Physics et al. versus

10    Winstead in which the PTO is an intervenor.

11         May I have appearances, please, first for plaintiff.

12              MR. DAVIS:   James Davis with Klemchuk Kubasta in

09:23:51 13   Dallas, and William Dunnegan of Dunnegan & Scileppi from

14    New York on behalf of plaintiffs, your Honor.

15              THE COURT:   Thank you.

16         For the Winstead firm.

17              MR. KRYDER:   George Kryder representing Winstead,

18    your Honor.

19              THE COURT:   For the PTO.

20              MR. CASAGRANDE:   Thomas Casagrande for the United

21    States Patent & Trademark Office, your Honor.

22              MS. PARKER:   Tami Parker with the U.S. Attorney,

23    your Honor.

24              THE COURT:   Thank you so much.

25         All right.  I want to cover a few things before we get

09:24:19 1    started.

2          I'm a little bit -- I find the procedural posture of the

3    case a little bit odd, so I want to talk about that for a

4    moment.

5          The position of the plaintiff, Mr. Kryder, in some of the

6    plaintiffs' papers is that it was proposed somewhere along the

7    way that this proceed as a summary judgment, and that Winstead

8    declined, so I'm reviewing the issues here on a motion to

9    dismiss basis except that the PTO is in effect moving your

10   position as a motion for summary judgment.  I find that to be

11   odd.

12              MR. KRYDER:  The Court will, I trust, recall when we

13   were here last time you dismissed the complaint, the original

14   complaint, for their overreaching position, and then granted

09:25:17 15   them leave to amend, but in the process the Court indicated

16   that as a guide that we could renew our motion to dismiss the

17   amended complaint.

18         And I think the Court remarked as well -- I can find it

19   in the transcript -- that we didn't need to go through

20   additional briefing.

21         So what we have done is, in accordance with that, proceed

22   in that manner.  We didn't think they pled under Twombly what

23   this amended complaint is about, they can't support it, and it

24   was -- the limited discovery that the Court permitted us, or

25   permitted them to have, that we have submitted in connection

09:25:57  1    with it.

2          THE COURT:   Well, let me just give an example of an

3    issue here.  I mean, the approach of the plaintiff is that if

4    the Court is inclined to reconfigure this matter in summary

5    judgment, then they need more discovery on the issue, for

6    example, of whether 18 cents per page, assuming that any of

7    these documents were actually charged to a client, is not a

8    figure that is devoid of profit.  That is, that the firm is

9    violating its ethical obligation by making a profit.

10   Therefore, there is a fact question, and they want to run that

11   one down the pipe.

12         MR. KRYDER:   Well, the Court remarked at the last

13   hearing that that is the definition of a fishing expedition.

14         First of all, they had to have a good faith basis in law

09:27:00  15   and fact to assert in the amended complaint that, one,

16   Winstead maintained a library of articles, that's proven to be

17   false; and two, that Winstead made a profit, that is incorrect

18   as well.  You don't get to file a complaint, and then seek

19   discovery to try to back it up.

20         The Court indicated at the last hearing that they were

21   very much on the edge of Rule 11.  We were not permitted to do

22   discovery on that issue, but the fact is, your Honor, the

23   limited discovery the Court allowed them to have shows that

24   there were three photocopies in all of the files that Winstead

25   had.  Winstead could not determine that any client had ever

09:27:45  1   been charged for any of those photocopiers, which makes sense.

2   It's difficult to tell whether anybody had been charged.

3          THE COURT:  I want to make sure I understand that,

4   Mr. Kryder.

5       Is that because if you're my client, I send you a bill,

6   and on the bill it includes a thousand photocopies for the

7   month, but I'm not going to say what the photocopies are on

8   the bill?

9          MR. KRYDER:  Exactly.  I don't know any firm in this

10  town, state or country where someone is able to discern it on

11  that basis.

12      Having said that, there are only three copies.  Winstead,

13  after reasonable inquiry, could not determine that any client

14  had ever been charged.

09:28:25  15   Some of the clients for whom these articles relate -- and

16  incidentally, only three of the articles remain in issue.  But

17  some of the clients don't get charged at all.  That's their

18  arrangement with Winstead.  But any client who did get

19  charged, it's no more than 18 cents a copy, and there has been

20  the sworn interrogatory answer by Mr. Campbell on behalf of

21  the firm as Winstead's general counsel, that they do not make

22  a profit on it.

23      It's consistent with practice, the ABA ethics opinion,

24  and guidelines that is reasonable for a law firm to recoup its

25  reasonable expenses.  That's what Winstead has done.

09:29:08   1        So they can't have discovery to go out and say, hey,

2    Winstead, let's now talk about your benefits for your copy

3    operator, your electrical charges, all these other things.

4    Winstead does not make a profit, and therefore there is no

5    discovery necessary.

6        The other things that they say they want in terms of

7    sweeping discovery are to try to find out what people do, what

8    is on some of these communications that are between or among

9    Winstead's key personnel.

10        That, again, is a fishing expedition.  So that discovery

11    is something that is an attempt to manufacture a claim where

12    none exists.  They had to have a factual basis before they

13    filed the original complaint, before they filed the amended

14    complaint.  This is an instance of Whack A Mole, Judge, where

09:30:01   15    every time we come up with -- they come up with a theory, we

16    beat it down, and now they want to argue something else.

17            THE COURT:   Thank you.

18        I have a couple of preliminary questions, Mr. Kryder, and

19    then I'll give you an opportunity to argue.

20        With respect to the PTO's position, I'm not quite sure I

21    understand what it is that the PTO wants the Court to declare.

22        I mean, these issues are fact intensive.  We can have a

23    general discussion.  If I adopt the position that Mr. Kryder

24    is advocating for the firm, that lawyers may make incidental

25    and necessary copies, these are phrases that you're advocating

09:30:52  1    as a further explanation, fair use, in this context, but that

2    doesn't really answer the question.

3        You can imagine, I can imagine, that a firm is making

4    more copies than would satisfy necessary and incidental, and

5    it would just depend on what the firm is doing.  So what's the

6    point, and why should I, step out into a general statement of

7    the law onward from the fact?  Why would I do that?

8        MR. CASAGRANDE:  Well, your Honor, we're not asking

9    the Court to do that.  What we're asking the Court to do is in

10   the context of the facts in this particular case that have

11   been alleged in the complaint, and the facts that came out in

12   the limited discovery, is to rule that as a matter of law the

13   fair use defense covers those activities.

14       We think that the formulation that we have offered of

09:31:55  15   applying those core facts to the fair use factors in this case

16   would be very helpful to give guidance to patent lawyers as to

17   what sort of core activities would under any reasonable

18   circumstances fall within the fair use defense.

19       The fair use defense has four factors that your Honor has

20   to apply in this case, or any other case raising the fair use

21   defense, but we think that the core things that Winstead has

22   been accused of, and which the discovery bore out, are

23   comfortably within what we have described as the necessary and

24   incidental circumstances.

25       THE COURT:  Well, it's an odd set of circumstances

09:32:39  1   for the reasons I mentioned earlier.  This case has been a
2   moving target.  I don't think it's overstating to say that.
3       It looked like the original complaint -- small C
4   complaint -- was over the firm making copies of prior art and
5   submitting it to the PTO.  I think the original complaint
6   arguably complained about that, and also about the firm
7   keeping a copy.
8       Now, you're past that, I think, and I had questions, I
9   believe I mentioned Rule 11 at the beginning, and so I gave
10  plaintiffs an opportunity to go out there and see if there was
11  a legitimate basis for going forward, and we're still here.
12      But you're urging something that the firm has elected not
13  to, which is to proceed on a summary judgment basis.
14      If I do proceed on a summary judgment basis, the
09:33:45 15 plaintiffs are asking for discovery, because I limited pretty
16  severely the discovery.  So it's just an oddity that you're --
17  I don't mean this in an insulting way -- but in a sort of
18  paternalistic fashion the PTO is super protecting the firm by
19  taking a procedural approach that the firm on its own behalf
20  has elected not to take.  I just find it odd.
21          MR. CASAGRANDE:  Well, I believe our motion was
22  filed in the alternative, your Honor.  It was either a
23  judgment on the pleading under 12C, or for partial summary
24  judgment.
25          THE COURT:  Well, how do I do that?  I mean, I don't

09:34:26   1    see how this is a 12C case.   On the pleadings I know nothing

          2    about what they're doing.

          3        I mean, the argument has been made by the plaintiffs that

          4    they state a prima facie case of a violation of the statute,

          5    because they claim that their works have been copied without

          6    permission, without paying them, and I think it's undisputed

          7    that they haven't.   So I don't see that fair use is apparent

          8    on the face of the complaint.

          9        Do you?

          10           MR. CASAGRANDE:   Well, that's one of the reasons why

          11   we styled it in the alternative.   We were trying to straddle

          12   both the procedural posture of the case when your Honor heard

          13   Winstead's motion to dismiss, and then said that there would

          14   be another round of briefing on a motion to dismiss the

09:35:24  15   amended complaint.   And we know that your Honor also gave the

          16   plaintiffs an opportunity for some limited discovery.

          17       Since we had already answered, and Winstead was going to

          18   renew its 12(b)(6) motion, we thought, well, you know, it's --

          19   we're probably in a position where we could do what Winstead

          20   is doing, which in our case, since we had already answered,

          21   would be the 12(c) motion.

          22       Then on the other hand, there is some limited discovery.

          23   So we thought in that instance it would possibly be considered

          24   a Rule 56 motion.   So that's why we styled it in the

          25   alternative.

09:35:57   1        THE COURT:   All right.   What is the status of -- I

2   understand there are cases like this all over the country.

3   What is the status of the other cases?

4            MR. CASAGRANDE:   The case --

5            THE COURT:   Maybe I should be directing that to

6   opposing counsel.

7            MR. CASAGRANDE:   Well, I'm involved also in all

8   three cases, your Honor.

9        There is one in the District of Minnesota, another one in

10   the Northern District of Illinois.   The Minnesota one,

11   discovery has largely been completed.   I think it is, you

12   know, by deadline completed.   I don't know if there will be

13   any additional discovery.   There are dispositive motions,

14   cross dispositive motions pending, and a hearing scheduled

09:36:33   15   before the Court in late June.

16        The Illinois case is proceeding a little bit slower.

17   That's in discovery right now.   I think there is one

18   dispositive motion pending that the defendant law firm has

19   filed in that case that does not implicate the fair use

20   defense.   I'm not sure whether that's fully briefed yet or

21   not.

22            THE COURT:   All right.   Thank you.

23        All right.   Mr. Kryder, one more for you.

24        Why is this a Twombly Iqbal issue?

25        On the face of the complaint I'm not sure I see how I can

09:37:19  1   conclude that this is not plausible.  It might not be true,
        2   but I'm not sure how I at this point can conclude that what is
        3   alleged is not plausible, which is the standard set out in
        4   those cases.
        5            MR. KRYDER:  Two things.
        6       One, Twombly has to be plausible.  It is not plausible
        7   that when they even indicate in their complaint at paragraph 3
        8   that Winstead is a law firm, and they admit that all of these
        9   articles were submitted to the PTO as part of patent
       10   prosecution.
       11       It is not plausible, number one, under Twombly, that
       12   Winstead operates as a commercial copy shop.  That's --
       13            THE COURT:  Well, I understand that one.
       14            MR. KRYDER:  And to the extent that there's the
09:38:08 15   procedural posture of this being a motion to dismiss, which we
       16   understood the Court wanted us to renew, the Court could
       17   convert this to a Rule 56 motion based on the record before
       18   it.
       19            THE COURT:  Well, Mr. Kryder, I have to -- part of
       20   the confusion may be my fault, but when I invited you to come
       21   back again, I wasn't thinking ahead of whether the other side
       22   was then going to claim that because the Court would be
       23   resolving the issue based on the factual development in the
       24   record that inevitably it must be a summary judgment, which is
       25   the position that they're taking.

09:38:53  1       I mean, I can meddle just so much. I didn't anticipate

2  that we would be here, so I wasn't -- I had not made a

3  judgment that the procedural vehicle for you was a motion to

4  dismiss. I was just saying to you come back again when --

5        MR. KRYDER: I understand.

6        THE COURT: I had not used the term.

7        MR. KRYDER: The Court can convert this, and Courts

8  do it all the time, to a Rule 56 motion. And on the record

9  before it, they do not survive. And the discovery that they

10  want is something that I respectfully would urge this Court

11  would not permit.

12        What they say they want -- because they had to have a

13  good faith basis in law or fact before filing their motion for

14  leave for an amended complaint. They had to have a basis to

09:39:47 15  contend that Winstead was maintaining a library, which they

16  weren't. That Winstead was making a profit, which they

17  weren't.

18        The Court asked whether they had any basis, and they

19  couldn't come up with one. And they don't have one, and they

20  don't get to go out now -- and the discovery they say they

21  want is to dispose Winstead personnel concerning their hard

22  drives. There is already the supplemental appendix and the

23  sworn interrogatory answer from Mr. Campbell that there is

24  nothing on the hard drives. So there is no reason --

25        THE COURT: I'm going to come back to this, because

09:40:26   1   you're getting a little ahead of me.  I do want to hear from

2   you on that.  I'll hear from you when you're on.

3          MR. KRYDER:  Just briefly, your Honor, what we have

4   here is a continuing game of Whack A Mole from the plaintiff.

5          The first time around they had an overreaching complaint

6   that took the outrageous position that submitting articles to

7   the PTO pursuant to a lawyer's ethical and legal duty

8   constitutes copyright infringement.

9          There was no basis for that.  The Court dismissed the

10   complaint.  Copies that are incidental to patent prosecution

11   are fair use.  That's the goal.  That is what Winstead does as

12   a law firm.  Winstead should be entitled to its attorney's

13   fees in prevailing in that position.

14          The central question that was involved at the beginning,

09:41:09   15   and is there still now, is whether patent lawyers have a fair

16   use right to make or keep incidental copies of literature

17   where it's integral to researching, preparing, filing or

18   prosecuting patent applications.  You don't have to get into a

19   broad discovery on that.

20          Was this incidental to patent prosecution?

21          The answer still is yes.  Every one of these 13 articles

22   the plaintiffs concede was submitted to the PTO.  Winstead was

23   required to submit it as evidence of prior art.  This is --

24   that question isn't going to change based on discovery, or any

25   other activity.

09:41:52  1        THE COURT:  Well, I think I have made clear, and I

2    think the plaintiffs have responded accordingly, but let me

3    get this in the record now.

4        Mr. Dunnegan, is it accurate that you are not claiming

5    that submission of photocopies to the PTO constitutes

6    infringement?

7            MR. DUNNEGAN:  Your Honor, we have to make our

8    position a little bit more precise than what you just stated.

9        The language that we used in the amended complaint -- and

10   I'm paraphrasing now -- was that we are not claiming

11   infringement to being copies that the law firm submits to the

12   United States Patent & Trademark Office that are required to

13   be submitted by the rules and regulations of the Patent &

14   Trademark Office.

09:42:40 15      For example, if they took an article which has absolutely

16   nothing to do with a patent, and they filed that with the PTO,

17   that would not be excluded from the amended --

18           THE COURT:  Well, why would they do that?

19           MR. DUNNEGAN:  Well, it happens all the time, your

20   Honor.

21           THE COURT:  Well, it's because some lawyer thinks it

22   has something to do with the patent.

23           MR. DUNNEGAN:  Not necessarily.

24           THE COURT:  Well, why else would it happen?

25           MR. DUNNEGAN:  Because what happens is people will

09:43:06  1   be filing a series of patents -- and I have encountered this
        2   in my other case -- and there was 45 pieces of prior art filed
        3   in that case, and that case had the same general subject
        4   matter as the case that they're working on, so they
        5   electronically import all the copies of the prior art from
        6   that case, and dump them on the Patent Office in the case that
        7   they're working on without ever having read them.
        8       That is -- your Honor, it surprised me too to some
        9   extent, but in both the other cases in Illinois and in
        10  Minnesota that's the practice that we are finding.  There is
        11  routine mass submissions of blocks of prior art that have not
        12  been read.
        13          THE COURT:  You're not claiming that here.
        14          MR. DUNNEGAN:  We -- when you say we're not claiming
09:43:55 15  that here, we're saying if it was necessary under the rules
        16  and regulations to be submitted, then we're not counting that
        17  as an infringement.
        18          THE COURT:  Okay.  Based on the limited discovery
        19  that you have, do you have any reason to believe that Winstead
        20  dumped on the Patent Office articles that it could not in good
        21  faith argue were prior art?
        22          MR. DUNNEGAN:  As of this moment, no.
        23      However, that determination really can't be made until
        24  you ask the lawyer if he in fact read it.
        25          THE COURT:  Well, should I just left you slop around

09:44:39   1    because maybe you will find something bad?

2        I mean, if that's the way we go, then every law firm will

3    be sued by you and you will take discovery and maybe you will

4    find something.  That's not the way it works.

5             MR. DUNNEGAN:  No.  No, your Honor, not at all.  Not

6    at all.

7        They're making copies clearly.  They are making copies

8    that have nothing to do with their patent -- with their United

9    States patent prosecution practice, at least to some extent.

10       And there is the issue which you raised which you really

11   haven't focused on that much, but is the particular copies

12   that they made going to be an infringement, and we cannot say

13   categorically that it will not be an infringement.

14            THE COURT:  Okay.  Mr. Kryder, you will address,

09:45:33  15   because it's sort of hanging out there, hanging out in the

16   PTO's approach also; and that is, a foreign patent, I want to

17   come back to that in just a moment.

18            MR. KRYDER:  Sure.

19            THE COURT:  But I need to understand a little bit

20   better the plaintiffs' position.

21       If the PTO sends back an initial office action that

22   attaches to the action the -- I'll say the same article that

23   was submitted by the Winstead firm in connection with the

24   initial prosecution, and the firm copies that initial office

25   action in its entirety, including the attached article, you're

09:46:24  1  claiming that that is an infringement.  Is that correct?

2  MR. DUNNEGAN:  Well, your Honor, there is probably

3  going to be more facts involved in what you stated, but

4  generally yes, I would think that they got the copy from the

5  PTO, and they can work with that one, and they further copy

6  it, that's going to be included in the amended complaint.

7  THE COURT:  Well, we're not here about whether they

8  can do that in terms of routing copies.  We're here about

9  whether it is as a matter of law a fair use to send to one's

10  client a document received by the PTO -- from the PTO without

11  stripping things off of it.

12  I find it pretty unimaginable that a lawyer is required

13  to strip down an official document received from a government

14  agency to avoid an infringement claim.  I find that

09:47:22  15  practically impossible to contemplate.  So you will come back

16  to me then.

17  Is it correct that the -- at this juncture there are only

18  three articles that are in dispute?

19  MR. DUNNEGAN:  No, there is not, your Honor.  There

20  were three articles.  They have admitted for two of them a

21  large number of copies.  From one, I think four or five

22  copies.  And then for the rest of them they are taking the

23  position that there were no copies.

24  Now, there is an incongruity in which they are disclosing

25  information.  I'm not saying they did anything that was

09:47:57   1    improper, but we have 13 articles, and for two of them there

2    is 28 or 38 copies that we can count, and then for some of

3    them there is not even a copy made to memorialize the

4    submission to the PTO.  We find that very odd.  And there is a

5    lot of -- there is a lot of irregularities in the way they

6    have disclosed these things, which I can get into now if you

7    want.

8             THE COURT:  No.

9             MR. DUNNEGAN:  But there is not -- I mean, we're not

10   prepared to say we're taking out everything except the three

11   articles.

12            THE COURT:  All right.  Go ahead, Mr. Kryder.

13            MR. KRYDER:  Your Honor, I'm hearing a lot of

14   shuffling, backfilling, nothing that is cited to the record,

09:48:40  15   and I'm hearing about other cases.  We're here about this

16   case.

17       Every article that is in question that's on the exhibit

18   to the amended complaint was attached to or associated with a

19   patent application.  One of the articles related to as many as

20   11 patent applications.  So this is not a circumstance, as

21   counsel is saying, where Winstead dumped something in the

22   record.  There is none of that.

23       We have interrogatories that the Court allowed that were

24   narrowly contoured.  Every article here was attached to a

25   patent application.

09:49:15  1          Winstead was making copies that were incidental to a

2   patent prosecution.  There is no evidence that it wasn't.

3          In terms of the issue of -- that we cannot -- Winstead

4   cannot send a communication received from the PTO to the

5   client, it's another one of their positions that certainly

6   does not -- it's beyond any credulity.

7          Since it was on the Court's mind, you asked about

8   submission on one of the copies went to a foreign attorney in

9   connection with a related patent application.  Whether you

10  submit something to the UK Patent Office, the German Patent

11  Office, the Canadian Patent Office, it's still a

12  quasi-judicial function.  It's just as transformative.

13         Winstead's ethical obligations don't stop at the U.S.

14  border, and the quasi-judicial nature doesn't stop at the U.S.

09:50:25 15  border.  There is no difference between submitting one of

16  these articles and a related U.S. Patent Office application to

17  a foreign correspondent who may be in Canada, United Kingdom

18  or Germany or elsewhere.  It's makes no difference whatsoever.

19  It still has the same protected fair use, because it's in

20  connection with a patent prosecution.

21              THE COURT:  Let me talk about this transformative

22  issue for a moment.

23        I think that's an unfortunate term, because in this case

24  nothing has changed that this term evokes a change.  I think

25  the PTO's hearsay analogy was helpful, that it's being offered

09:51:12  1    for a different purpose.  I think that -- we're using the word

2    "transformative," because that's the word in the case that I

3    find it difficult because nothing has changed, but it's not

4    being used for its educational scientific purpose.  It is to

5    inform the regulator about the state of the art.  I appreciate

6    the analogy that was suggested.  I think that's helpful.

7            MR. KRYDER:  I think the PTO general counsel's

8    opinion at pages 3 to 6 says that it's transformative because

9    the copies document solely for purposes of patent examination

10   and prosecution that certain features of the applicant's

11   claims are already in the prior art or obvious.  So it is

12   using it for a different purpose.

13           THE COURT:  When it comes back, if it comes back in

14   the way that I mentioned and that's sent to the client, that

09:52:19  15   is -- that is not for those purposes at that juncture.  That

16   is the lawyer's obligation to inform the client.

17           MR. KRYDER:  Also, the client, to the extent that

18   the client is the inventor, the inventor, he or she, also has

19   legal obligations of disclosure to the PTO.

20           THE COURT:  Well, I agree.  I'm just commenting on

21   the re-routing issue.

22           MR. KRYDER:  Right.

23           THE COURT:  At that point those purposes are not

24   served by the confidential communication between lawyer and

25   the client.

09:52:48 | 1          MR. KRYDER:   I would agree.

2      In terms of transformative -- I mean, that is one of the

3   issues that the Courts look to to -- that the Supreme Court

4   has given us in terms of the analysis.

5      I think it is transformative.  The -- Winstead uses the

6   articles to determine the materiality.  You have to read them

7   to determine the materiality, and to see whether they relate

8   to the prior art.

9      It's interesting that plaintiffs' counsel is shuffling

10  all over the place in terms of on the one hand they say

11  Winstead shouldn't read it, only one lawyer or one staff

12  member should read the article, and then he goes on to say he

13  wants to take a deposition to see if the lawyer read it.

14     I mean, you have to be able to read, review, analyze and

09:53:39 15  assess what is in that article, and then when you make an

16  information disclosure statement, part of what Winstead

17  argues, and I believe this is what the PTO is arguing, is this

18  compilation of this information showing what the state of the

19  prior art is, and that this article of this invention all

20  relate to it is part of the disclosure.

21          THE COURT:   Let me interrupt you for a moment.

22     Am I correct that the plaintiffs could look at all of

23  these patent applications, because you have identified the

24  patent numbers, and -- but I don't know the state of the

25  application?

09:54:20    1          MR. KRYDER:  Right.

            2          THE COURT:  Is this information -- well, let me ask

            3    it differently.  Just a simple question.

            4          Could the plaintiffs verify that the articles relate to

            5    the subject matter of the patent?

            6          MR. KRYDER:  Yes.

            7          THE COURT:  So that -- I mean, I suppose in the

            8    world of the theoretical -- I'm not the judge in the Minnesota

            9    case or the Illinois case, and I'm not taking on the burdens

           10    of those cases -- but in theory if I were applying for a

           11    patent on a telecommunication device, and I attached a bunch

           12    of articles that related to how to make concrete, I couldn't

           13    argue that those concrete articles were prior art?  I'm trying

           14    to give you something preposterous.

09:55:16   15          MR. KRYDER:  Right.  I don't see how.

           16          THE COURT:  Okay.  So assume it's completely

           17    unrelated.

           18          I don't have any of that here?

           19          MR. KRYDER:  Not only that, the Court will recall

           20    the original complaint had only two articles attached.  Then

           21    they went out --

           22          THE COURT:  Then 11 more were added.

           23          MR. KRYDER:  Eleven more were added.  What they did

           24    was go out and search the PTO database for applications and

           25    actual patents.  And --

09:55:43  1    THE COURT:   By Winstead?

2         MR. KRYDER:   By Winstead.   What they were able to

3    determine -- and you can look at the file, in some instances

4    they can go to and order the patent file wrapper.   You can see

5    everything that is in an actual issued patent file.   You can

6    get a copy of these articles from the PTO for a fee.   It's not

7    publicly available on the regular database, but it can be

8    obtained, the same articles, because they are evidence of the

9    prior art, and they are in the file jacket, the file wrapper,

10   at the United States Patent & Trademark Office.

11        But they can tell -- and there is no indication here that

12   Winstead attached a concrete tensile-strength article to

13   something that relates to something about thermocouplers and

14   antennas and the like.   There is absolutely none of that.

09:56:40 15       Every copy or communication about the articles was

16   incident to the protected fair use activity.   That's what

17   Winstead has sworn to.   It's what they have said.

18        We think, your Honor, that some of this is

19   transformative, if the Court has a concern about that, in part

20   because it's legally mandated.   You have to assemble this art.

21   You have to make an argument to the PTO.   The PTO is going to

22   respond, sometimes with temporary and other application

23   actions, and Winstead and its inventor clients have a duty to

24   read and respond to what the PTO communicates, and to

25   participate in this quasi-judicial proceeding.   That is

09:57:25   1    something that none of the cases that the plaintiffs have

2    cited addresses.

3        This is a quasi-judicial proceeding.  It's no accident

4    that these articles are submitted as evidence of prior art.

5        Your Honor, no matter -- no discovery is going to change

6    the fact that Winstead never charged any of the clients for

7    any of the copies that were submitted to the PTO, or to any of

8    the copies that were exchanged among key attorneys and staff.

9        Same with the foreign patent attorney to the extent that

10   that --

11       THE COURT:  Well, let me back up for a minute.  I

12   just want to make sure I understand you, Mr. Kryder.

13       You are not in a position, and are not representing to

14   the Court, that those copies were not charged for, you're just

09:58:13  15   saying it is impossible to prove that they were?

16       MR. KRYDER:  No.  I'll make two distinctions.

17       Photocopies, there were three in the file.  Winstead made

18   reasonable inquiry and was unable to determine that any client

19   was charged for those three hard copies in the file.

20       If they were, they were charged no more than 18 cents,

21   and there was no profit.

22       With respect to digital copies --

23       THE COURT:  But as to those, there is no discovery

24   to be done?

25       MR. KRYDER:  There is none to be done.

09:58:47   1        THE COURT:  There are no -- you're representing to

  2  me, and it's in Mr. Campbell's declaration, that there are no

  3  records that would tell us whether those copies were

  4  chargeable?

  5        MR. KRYDER:  Correct.

  6        THE COURT:  Okay.

  7        MR. KRYDER:  Correct.

  8      With respect to the digital copies for a scan or a pdf

  9  file that's attached to an e-mail, the record is also clear

  10  and sworn that Winstead doesn't charge for the scans, and it

  11  doesn't charge for the e-mail.

  12      So the fact that a copy of an information disclosure

  13  statement and one of these related articles may have been sent

  14  to members of the team at Winstead, nobody got charged for any

09:59:36 15  of those copies, nobody got charged for those e-mails.

  16      The most the plaintiff can say is Winstead made an

  17  indirect profit because more than one person read or had the

  18  opportunity to read that e-mail.

  19      So what?  That is not making a profit on the copy.  That

  20  is not maintaining a library.  That is not a commercial copy

  21  shop.  It's practicing law.

  22        THE COURT:  Are you intending to talk about this

  23  document management system issue?

  24      I'm a little stale on law firm management issues, so I

  25  need a little schooling about what that means.

10:00:18   1        MR. KRYDER:  All right.  One of the things the

2   plaintiff has tried to do is to exponentially multiply the

3   number of copies by saying if there is one scan of this

4   article attached to an information disclosure statement which

5   Winstead and its inventor client had a legal obligation to

6   submit, that if each of the members of the Winstead team got a

7   copy of it, that each one of those --

8        THE COURT:  These are my interns you're pointing at.

9        MR. KRYDER:  The interns.

10        THE COURT:  Mr. Rector, Mr. Donovan and

11   Mr. Grindinger.

12        MR. KRYDER:  I hope you have a wonderful experience.

13   I know you will.  I would love to have them on the jury.

14        But members of the team metaphorically --

10:01:03  15        THE COURT:  You should strike the panel if you get

16   that.

17        MR. KRYDER:  All right.  If given the opportunity,

18   I'll reconsider.

19        Just because any one of these members of the team got a

20   copy of that as part of their job in reviewing, analyzing,

21   typing, whatever their job may be, that isn't -- nobody was

22   charged for each of those copies, nobody was charged for each

23   of those e-mails.

24        The technology is that -- for most e-mail systems there

25   is something called single-instance copying, and what it

10:01:43  1    means, strangely, is that if I have an attached pdf, which is

2    the information disclosure statement and these articles, and I

3    send it to five different people, the untutored person would

4    think, well, that must mean that there are five separate

5    copies.

6         Actually one of the Microsoft server systems that we

7    cited in the brief in our motion, at the time what it does is

8    save only one copy on the network.  And what happens as it

9    goes out to each person, they are accessing that one copy.

10         There have been various versions of that over time, and

11    because of the number of years involved in the discovery, we

12    can't tell.

13         THE COURT:  Okay.  But you're -- what you're

14    explaining to me is that that issue is not a matter of the

10:02:39  15    design of the sender.

16         In other words, if I want to e-mail a copy of my opinion

17    to all of you, there may be -- if I send it to counsel at the

18    table, there may be five copies on my system, or there may be

19    one.  I don't have any idea.

20         MR. KRYDER:  No.  I mean, somebody probably -- I

21    mean, somebody in IT in the United States Government could

22    probably tell, but on different systems they will have a

23    single instance where there is only one copy, in others there

24    will be more.

25         The Court doesn't even need to go there, though, because

10:03:16  1    none of those copies resulted in a charge to the client.  None

2    of them -- Winstead doesn't charge for e-mails or scans.

3         The most --

4              THE COURT:  Well, I think that the cost/profit issue

5    is germane, but I don't think it's dispositive.

6         The plaintiffs' position would be that if Winstead never

7    charged a dime, or 18 cents, for a single copy of anything,

8    but was willy-nilly making copies of the published copies far

9    beyond what any of us would claim to be necessary.  It doesn't

10   matter if you didn't make a profit.  They were deprived of a

11   profit.  That's their argument.  So the profit issue is not

12   dispositive.  So I am interested in the number of copies that

13   are being made.

14        If you are making a profit, that hurts you.

10:04:14  15   If you're not making a profit, it doesn't necessarily

16   exempt you.

17             MR. KRYDER:  I understand.  And the -- but the issue

18   of -- you have to look at whether -- I do think you can't

19   divorce the issue of profit from -- I mean, their pleading

20   claims that we maintained a library, and the Court just asked

21   about, well, if they were making bunches of copies, what

22   Mr. Campbell has confirmed after inquiry of the firm, they

23   don't maintain libraries on their hard drives, they don't

24   maintain some central library which the plaintiff was trying

25   to shoehorn this in as in Texaco, and they don't charge by the

10:04:59  1   e-mail.

2   What you have are multiple people admittedly who are

3   looking at documents that are being submitted in the course of

4   prosecuting patents before the United States Patent &

5   Trademark Office.

6   THE COURT:  Can the document management system -- is

7   it searchable?

8   In other words, if I come to work at Winstead as a lawyer

9   and I'm working on a patent prosecution on cellular

10   technology, can I search the document management system to

11   find prior art that might have been retained on -- I'm going

12   to say the hard drive, although I don't think this is

13   scientifically correct terminology -- to find what prior art

14   is there that relates to cellular technology?

10:06:03  15   MR. KRYDER:  No.  That would be -- that would be a

16   library-type system.

17   Let me make two distinctions.

18   THE COURT:  Well, whether it's maintained for that

19   purpose or not, Mr. Kryder, I'm asking you if the system

20   allows for that kind of searching.

21   MR. KRYDER:  There are two different systems.  Let

22   me address them in one order.

23   There is a -- Winstead, like most law firms, has a

24   document management system, for example, on which you could

25   save a Word document, a PowerPoint, a pdf, and the

10:06:34    1    interrogatory answer indicates that one or more copies of an

2    article was saved in the electronic client file that is on the

3    document management system.

4         So in other words, a scan of an information disclosure

5    statement and/or an article could be saved on the system, but

6    it will be assigned a client matter, a client number and a

7    matter number that relates to that patent prosecution.

8         In other words, it is the client file that happens to be

9    electronic.  A lawyer can go find that document as part of a

10   client file on that one narrow system.

11            THE COURT:  I'm going to make it up.  The Kryder

12   article.

13        So I get hired by Winstead, I'm doing some research on

14   cellular technology, the Kryder article relates to cellular

10:07:26   15   technology, can I somehow get into the Winstead system and

16   type in the phrase, "cellular technology articles," and find

17   this?

18            MR. KRYDER:  No, that's not my understanding.

19        The only instance of a document being saved apart from an

20   e-mail is something that is in an electronic client file.  The

21   lawyer, her secretary or assistants and others may know that

22   that document is there, but it's not a full text search where

23   someone is going to find that.

24        That's no different than having a hard copy client file.

25   It just happens to be electronic.  So that's the -- that is a

10:08:03  1    document management system that most law firms would have, but

2    there is not some library maintained.  That's what the

3    interrogatory answers indicate.  There is no library or copies

4    maintained on the C drives.

5         In fact, lawyers and staff can't even save to the C

6    drive.

7         The separate thing would be copies that relate to an

8    e-mail --

9              THE COURT:  Go ahead.

10              MR. KRYDER:  And so those are the copies, the main

11    number of copies that the plaintiff is complaining about.

12         I keep coming back to this, though, Judge, that Winstead

13    has sworn that it didn't charge for any electronic copies that

14    they had made.  They don't charge for scans.  They don't

10:08:46 15    charge for e-mails.

16         So what it really comes down to is whether it's

17    incidental to patent prosecution.  Winstead has sworn that the

18    copies made were incidental to its preparation and prosecution

19    of patent applications under its legal and ethical

20    obligations.  There is nothing to refute that.  There will be

21    nothing to refute that.

22         What the plaintiff is apparently trying to argue is that

23    there should be exceptions.  That a -- that communications

24    from the PTO to a lawyer cannot be forwarded to the client.

25         That's preposterous.  They're taking other positions that

10:09:26  1    are preposterous.

2         I think, though, Judge, if you come back to what the

3    original amended complaint was, they took the position that

4    this was Texaco or Princeton.

5         We have briefed this extensively in our motion at pages 6

6    through 8, and in our reply at page 8.  This isn't the Texaco

7    case.  That had an institutional policy of --

8              THE COURT:  I am familiar with the case.  I

9    understand the distinctions here.

10             MR. KRYDER:  I think other issues in terms of it

11   being what the plaintiff is arguing, they say that the Court

12   should find it's not fair use because Winstead reaps an

13   indirect benefit by having lawyers read the articles.

14        You have to read them.  You have to review and analyze

10:10:17  15   them to know whether they can be submitted to the PTO.

16        The fact that you have multiple people on a team as part

17   of that process, that's called practicing law.  It's not a

18   copy shop.  It's practicing law.  It's prosecuting a patent.

19        That's an easy test.  Is it incidental to the prosecution

20   of a patent application?  Every one of these is yes.  You

21   won't hear them say, no, that these 13 articles weren't

22   related to specific patent applications.  They were.

23        What we're doing is forwarding cost free copies of these

24   articles internally to staff, externally to clients, and in

25   one instance to a foreign patent associate in the course of

10:11:04  1  prosecuting a foreign patent.  None of that is anything other

2  than prosecuting a patent.

3  Unless the Court has other issues, I guess I would say

4  that for the reasons that we have indicated in our briefs that

5  we think that the motion should be granted.

6  To the extent the Court is concerned that this really has

7  become a Rule 56 motion, then certainly the Court has the

8  option of converting it to that.

9  We don't think that discovery is appropriate under the

10  circumstances here.  They don't get to discover a claim that

11  they had no basis to plead or prove to begin with.

12  I reserve the balance of my time for any rebuttal.

13  Thank you, your Honor.

14  THE COURT:  All right.  Mr. Casagrande, I'll hear

10:12:00  15  from you now.  Thank you.

16  Let me see if we still have this standing issue so we

17  don't waste our time on that.

18  Are you still claiming that the PTO doesn't have standing

19  to address the issues that are addressed by the PTO's motion?

20  MR. DUNNEGAN:  Yeah.  As to the Newport News case,

21  yes.

22  THE COURT:  Go ahead.

23  Give me just a second.

24  MR. DUNNEGAN:  Your Honor, can I clarify that?

25  My standing issue relates to their counterclaim.  It does

10:12:49  1  not relate to their Rule 26 intervention on behalf of the

2  defendants.

3      THE COURT:  All right.  Excuse me just a moment.

4  There is something urgent that I have to attend to.

5      (Off the record.)

6      THE COURT:  All right.  Thank you so much.

7      Time wise I'm okay for this morning, so I'm not under a

8  time crunch here, so take your time.

9      MR. CASAGRANDE:  The Patent & Trademark Office

10  really wants to be practical about this, and so what I wanted

11  to clarify, if I could, if your Honor could ask this of

12  plaintiffs' counsel.

13      When he said they're not contesting our Rule 24

14  intervention, Rule 24 requires someone who intervenes to file

10:15:41  15  a pleading, and our pleading had, as well as the declaratory

16  judgment counterclaim, a defense which basically had the exact

17  same language about the necessary and incidental

18  circumstances.

19      If Mr. Dunnegan is conceding that we have authority to

20  pursue the defense that Rule 24 required us to put in, then I

21  would concede that your Honor does not need to rule, or does

22  not need to consider our declaratory judgment counterclaim

23  since essentially they ask for the exact same relief, the

24  dismissal of the complaint.

25      MR. DUNNEGAN:  Your Honor, what I hear him saying is

10:16:21  1    do we -- are we contesting at this point his Rule 24 ability

2    to intervene on behalf of the defendant without asserting a

3    counterclaim.

4         No, we're not challenging that.  It's an assertion of the

5    counterclaim as part of their initial pleading which we are

6    saying that they do not have standing under the Newport News

7    case to bring.

8              MR. CASAGRANDE:  Well, while we disagree with that,

9    as your Honor has seen from our papers, that we don't have

10   standing to bring the counterclaim.

11        If your Honor were to engage in a ruling in this case on

12   the merits, and it addressed the substance of the fair use

13   defense that the Patent & Trademark Office was offering to

14   your Honor, we would be happy with that.

10:17:08 15        THE COURT:  Well -- okay.  What's not going to

16   happen here is that I would rule for you, and not convert

17   their motion to dismiss into a motion for summary judgment.

18   That's not going to happen.  It's procedurally whacky for me

19   to do such a thing.

20        So either I'm going to grant -- if I rule for them, I'm

21   either going to grant their motion to dismiss, and not grant

22   your motion for summary judgment -- motion for judgment on

23   your pleadings, or I'm going to convert their motion to

24   dismiss to a motion for summary judgment.  If I granted that,

25   then your motion for declaratory judgment is moot, isn't it?

10:17:46  1      I mean, I can't -- I can't envision a circumstance where

2    I would rule for you without converting Winstead's motion to

3    dismiss to a motion for summary judgment.

4              MR. CASAGRANDE:  If I understand, your Honor, the

5    premise to your Honor's question, what I would suggest is that

6    our -- to the extent that our motion is a 12(c) motion in the

7    alternative, we would view that as consistent with their

8    posturing their motion as a 12(b)(6) motion since it's exactly

9    the same standards for both.

10             THE COURT:  Well, except in your analysis of the

11   fair use factors you're talking about the facts in discovery.

12             MR. CASAGRANDE:  I don't think we're talking about

13   them in any greater extent than what Winstead's motion has

14   discussed.

10:18:45  15             THE COURT:  To the same extent that Mr. Kryder is

16   for Winstead, and as I indicated by my first set of

17   questions -- and I may be responsible for it -- I'm troubled

18   by it because it is addressing factual matters that are not

19   present in the complaint.  I may not be able to get there

20   other than through a summary judgment.

21             MR. CASAGRANDE:  We don't --

22             THE COURT:  If I approach it that way, then I have

23   to give fair consideration to it, and I will, whether the

24   discovery that is proposed by the plaintiff is reasonable and

25   necessary for the outcome.

10:19:27  1        MR. CASAGRANDE:   We -- we agree with Winstead that

2    we don't believe as a matter of law based on the fair use

3    defense that's been asserted under the allegations in the

4    complaint that this case could as a matter of law be decided

5    in favor of the plaintiffs.

6        But our main interest is to ensure that when the Court is

7    presented with what the Court believes to be the proper

8    procedural vehicle to address the merits, that it consider the

9    necessary and incidental formulation that we have offered in

10   our affirmative defense and in our declaratory judgment

11   counterclaim.

12       We would like the Court to adopt that as a further

13   circumstance that informs the four fair use factors in the

14   context of the allegations in this particular complaint where

10:20:23 15  it's directed at law firms and their patent prosecution

16   practice.

17       That said, you know, I would leave the proper procedural

18   posture of that to your Honor.

19        THE COURT:   I understand.

20    All right.   Thank you.

21        MR. CASAGRANDE:   Okay.

22        THE COURT:   So you will pass for now?

23        MR. CASAGRANDE:   Yes.

24        THE COURT:   Thank you very much.

25    One more question for Mr. Kryder, and then I'll move to

10:20:54  1  Mr. Dunnegan.

2      Mr. Kryder, I'm a little fuzzy on this, and I haven't

3  researched it.  I can't remember if the rules were changed on

4  this ten-day issue.

5      It used to be that if a court sua sponte were converting

6  a motion to dismiss to a motion for summary judgment, there

7  had to be ten-days' notice of that to allow the other party to

8  supplement the record.

9      That's not in the rule, and I don't remember if that's

10  because it was taken out, or because it was never there,

11  that's just a Fifth Circuit interpretation.

12      Do you know?

13          MR. KRYDER:  I do not know.

14          THE COURT:  All right.  Mr. Dunnegan.  Thank you.

10:21:45  15      Okay.  Now, Mr. Dunnegan, you haven't had to answer as

16  many questions as the other lawyers have, so I'm going to ask

17  you a series of questions which I want you to address in your

18  argument.  You don't have to answer them now, but work them

19  in.

20      I need you to give me chapter and verse about what your

21  case is about.  Your complaint is very general.  You have

22  discovery.  Not as much as you want, but you have it.  I'm not

23  sure what you're claiming, and I want you to assume that the

24  facts are that the copies that were made were either made

25  electronically, there were limited hard copies, that there

10:22:32  1    is -- if you claim that you believe you could prove that

2    copies were actually charged for to clients; that is, that the

3    declaration of Mr. Campbell is inaccurate, I want you to tell

4    me how you would propose to do that.

5        I want you to explain to me where the line is between

6    copies that you're either conceding are legitimate, or you are

7    not arguing are illegitimate, and the reverse.  So that's a

8    good start, and I will probably have more.

9            MR. DUNNEGAN:   Okay.

10            THE COURT:   One more issue.

11        (Sotto voce discussion between court and law clerk.)

12            THE COURT:   So my law clerk just answered my

13    question for me.

14        The rules used to say ten days, and in 2010 they

10:23:34  15    dropped -- it was dropped and now it is a reasonable notice.

16        So there you go.   Thank you.

17            MR. DUNNEGAN:   Your Honor, let me start with your

18    first question, which is what is our complaint about.

19        Now, our complaint is about copyright -- our amended

20    complaint is about copyright infringement for 13 articles.

21        The specific articles that we are claiming infringe are

22    the ones that the defendants have made internally.  We don't

23    know what those are until they tell us, except the one that

24    was made that was required by the rules and regulations of the

25    Patent Office, and an archival copy for their files to

10:24:12   1   memorialize such transmission to the Patent & Trademark

2   Office.

3        Now, our prima facie case for copyright infringement is

4   met by making a good faith allegation that they made copies of

5   those articles.

6        Fair use is an affirmative defense on which the defendant

7   has the burden of proof.  Fair use need not be pled in the

8   initial complaint, because it is an affirmative defense on

9   which they have the burden of proof.  So we wouldn't expect

10   that the complaint would negate all the issues that would be

11   relevant to a fair use inquiry.

12        Now, if we were to -- if we were to fast forward and get

13   beyond the allegations in the complaint and say which copies

14   were made which are the subject of this case, let me go to a

10:25:08   15   specific example in their answers to interrogatories which are

16   attached to their appendix.

17             THE COURT:  Just a minute.  I have read those

18   extensively.  I want to have those in front of me.

19        In a second my other law clerk is going to come in here

20   and talk to me for a minute, so I will have to stop for a

21   second.

22             MR. DUNNEGAN:  Okay.

23             THE COURT:  Can you just direct me to those?  I have

24   read them, but give me a citation so I can find them fast.

25             MR. DUNNEGAN:  I think the easiest way is document

10:25:33  1    64 --

2                    THE COURT:   No.   Give me your appendix number.

3          Isn't it in the appendix?   Give me an appendix number.

4                    MR. DUNNEGAN:   I'm sorry.   The page number of the

5    appendix is 201.   This is their appendix, your Honor.

6                    THE COURT:   I have got it.   Just a second.

7          (Off the record.)

8                    THE COURT:   I'm sorry one more time.

9                    MR. DUNNEGAN:   Certainly it's their appendix on

10   their motion.   Page 201 is the page I was going to take you

11   to.

12                   THE COURT:   I have got it, and I have looked at it.

13                   MR. DUNNEGAN:   Now, dealing with what they disclose

14   on the entry relevant to 4-11-12 they made copies that were

10:26:57 15   sent by e-mail to foreign counsel in connection with foreign

16   patent prosecution proceedings.

17         That would be inconsistent with a fair use defense unless

18   they have a lot of facts that aren't in the record at this

19   point, because their fair use defense, as I understand it, is

20   if you look at factor one of Section 107, the purpose of this

21   is to comply with the obligations of the United States Patent

22   & Trademark Office under federal law.

23         If they're sending this outside of the country in

24   connection with a foreign patent application in a foreign

25   country in an attempt to obtain a commercial advantage in that

10:27:39  1   foreign country, then I don't think that has any -- I don't

          2   think that provides any basis whatsoever to say that, well,

          3   that was justified under the United States Copyright Act.

          4         And, in fact, the PTO, the general counsel of the PTO,

          5   says he doesn't even know the answer to that one, he would

          6   have to think about it, when I disposed him.  So that's one

          7   core --

          8         THE COURT:  Well, what is the difference -- I mean,

          9   let's just reconstruct this for a moment.

         10         Let's assume that this e-mail was to American co-counsel

         11   in connection with a prosecution of a patent before the PTO.

         12         You're complaint would be too many copies, but -- is that

         13   what you're complaint would be?

         14         MR. DUNNEGAN:  Well, yes, that's what we're saying

10:28:40 15   with respect to that one, too many copies without a license.

         16         But what they're doing -- what their defense to that copy

         17   to American counsel would be, well, this was necessary and

         18   incidental to PTO practice, which we would dispute.

         19         However, when you get to the copy that they're making for

         20   the foreign patent associate for the foreign patent

         21   proceeding, all the justifications concerning the Patent &

         22   Trademark Office rules and regulations go out the door.

         23         THE COURT:  Well, why do they?  Presumably you have

         24   the same obligations to make an accurate and complete

         25   disclosure to a foreign patent authority as you do to an

10:29:18  1  American patent authority.

2          MR. DUNNEGAN:  A, we don't know that; B, their

3  justification is some perceived conflict between the copyright

4  law and the patent law, which really is not a conflict at all,

5  because you can solve the problem with a licensed copy, but

6  there is no justification that would pull in the making of

7  the -- the seeking of a commercial advantage in a foreign

8  country as a basis or a justification to violate the United

9  States Copyright Act.

10          I mean, merely because you need to do it doesn't give you

11  an excuse to violate the United States law.

12          THE COURT:  Well, it does if it's a fair use.

13          MR. DUNNEGAN:  Exactly.  That's the conclusion, your

14  Honor.  If it's a fair use.

10:30:07  15          But in order -- the mere fact that you need to do it

16  doesn't make it a fair use.

17          THE COURT:  No.  But it is a factor in determining

18  if it's a fair use.  Your obligation to do it is in fact a

19  factor for the Court to consider.

20          MR. DUNNEGAN:  I would agree under United States

21  law, but if we are looking at the law of some foreign country,

22  I'm not sure I agree with you, because I don't think that was

23  intended to be taken into consideration.

24          THE COURT:  You just sort of wandered into this one.

25  I mean, you didn't have any good faith basis for claiming a

10:30:38  1   violation with respect to this, because you didn't know

2   anything about it.

3           MR. DUNNEGAN:  I'm not disagreeing with you, but we

4   had a good faith basis for believing generally that copies

5   were made.

6           THE COURT:  All right.  Okay.  Go ahead.

7           MR. DUNNEGAN:  I mean, we couldn't tell you in

8   advance exactly what copies were made.  It's in a black box

9   protected by privilege.  We can't know.

10          But through this very limited discovery we did, as I -- I

11  think you used the words, just blundered across this one, but

12  this is evidence of infringement for which I do not think the

13  defense of fair use should apply.

14          THE COURT:  Okay.

10:31:16 15         MR. DUNNEGAN:  Okay.  Now, the next topic your Honor

16  wanted me to address, I believe, was assume that the copies

17  were made largely electronically, and that there were limited

18  paper copies, how does that affect my case?

19          Well, an electronic copy --

20          THE COURT:  Well, I started with what discovery

21  would you possibly envision you could do to prove that there

22  were more copies made than alleged, than the declaration

23  requests, and that any of them were charged to the clients?

24          MR. DUNNEGAN:  Okay.  Let's take those one at a

25  time.

10:31:52   1      We don't have any documents whatsoever showing the making

2   of any of these copies.  All we have is a limited -- we have a

3   response to a limited interrogatory.

4      So at an absolute minimum I think we should be able to

5   look at, you know, what were the actual documents that

6   transmitted the copies?  Do they show other transmissions?

7      Now, Mr. Kryder mentioned the issue of hard drives, and

8   he said there were no copies -- I believe he said there were

9   no copies made on anyone's hard drives.

10      I don't know that that's not true, but if it is true,

11   that sounds extremely unusual to me as someone who has been

12   practicing for a long time.

13      Copies are circulated by e-mail certainly, and they have

14   got a lot of evidence of those.  But in terms of their hard

10:32:50  15   drives, no copies whatsoever on anyone's hard drive at all?

16      Very difficult.  Very difficult for me to believe.

17      THE COURT:  Well, okay.  If I credit what you just

18   said, very difficult to believe, you come here and I say,

19   well, I -- certainly my job is to allay any concerns that you

20   might have, so go off and go forth with discovery just because

21   you don't believe it?

22      It's under oath.  If Mr. Campbell is not telling the

23   truth, he will have a lot more problems than trying to allay

24   your concerns.  I have got a declaration under oath that that

25   didn't exist, and you have no good faith basis for coming in

10:33:33  1    here and telling me that it's not true except based on your

2    experience as a lawyer you don't think so.  It just doesn't

3    cut it for me.  Why should I let you pierce that just because?

4             MR. DUNNEGAN:  Because -- well, one example is -- is

5    that Mr. Campbell's declaration is upon information and

6    belief.

7        I'm not saying that he did anything improper.

8             THE COURT:  There is no way that a law firm could

9    ever file an affidavit in a different way than this.  He can't

10   possibly, nor can anyone, know exactly what information is

11   available in the firm without talking to anybody else.

12       You're making a hearsay objection to the verification at

13   page 198, and that is a purposefully proper verification in

14   the Court's view when an entity is involved.  There is no way

10:34:33 15  that any other kind of verification can be given than that.

16   It isn't possible to give one that is different than that.

17            MR. DUNNEGAN:  Let me suggest, your Honor, that

18   perhaps rather than say I surveyed the relevant attorneys and

19   staff, he could have said, I questioned the following people,

20   and an inspection of their hard drive was made.

21       It's the last line.

22            THE COURT:  Well, this isn't an exercise in

23   drafting.  This is the Court analyzing whether the

24   verification cuts the mustard and violates the hearsay rule,

25   and my answers to those two questions are yes and no.

10:35:10  1      So that's -- that -- that's a dead issue for you.  So I

2  wouldn't waste anymore time on that.

3           MR. DUNNEGAN:  Okay.  Now, moving forward to the

4  issue of how could we prove that there were profits made in

5  connection with the copying of these articles?

6      Let me suggest there is two ways.

7      The first way we haven't discussed very much.  It's

8  called the profit made by the intermediate use of the article.

9  That's a term that was coined in the Texaco case.

10      What that is, is that when you make use of a copyrighted

11  article and your copy was unauthorized, but you're using the

12  article as part of your commercial efforts, in this case

13  obtaining presumably an hourly fee for your services, then you

14  are deriving a benefit from the unauthorized copy which would

10:36:09  15  not have existed but for the fact you had an unauthorized

16  copy.

17      That's been recognized in Texaco as a valid basis for a

18  copyright owner to assert that there was a commercial purpose

19  under factor one of Section 107.  That's present here on the

20  facts that they have presented.

21      We don't have their billing records.  It wasn't directed

22  that they produce them.  I'm not criticizing them for not

23  producing them.

24           THE COURT:  Well, I'm confused.

25      If the commercial purpose issue is the point, then why

10:36:44   1   are you not pursuing the making of the photocopy for

2   submission to the PTO?

3       Because the commercial purpose exists at the time that

4   the patent is prosecuted.  I don't understand the principled

5   analysis here that it's okay to make a copy for the PTO, but

6   it's not okay to make a copy for the client, for example.  I

7   don't understand that.  They're both commercial works.

8            MR. DUNNEGAN:  I agree with your Honor, and I had

9   the same difficulty when I was instructed to take this

10  position.

11      I can make -- I can offer you two legal theories on which

12  it does make sense.

13      The first would be if we're dealing with a copy that is

14  actually submitted to the PTO.  There is a rule and regulation

10:37:42  15  of the PTO, Section 1.56, I believe, or 1.98, that requires

16  the submission of material noncumulative art in support of the

17  patent application if you know about it.

18      Now, the one copy that's going to the PTO arguably may

19  meet -- may be required for that purpose.  Even though an

20  unlicensed copy is not necessary, you can do a licensed copy.

21      But that's one factor which could come into play under

22  Section 107.1, which is the purpose of the use.  So that makes

23  the copy given to the PTO a little bit different than the copy

24  sitting in the files.

25      The second legal reason would be in these cases the

10:38:25  1   remedy which is available to the plaintiff is going to be

2   under Section 504(c) of the Copyright Act, which is statutory

3   damages.

4       And for statutory damages, those are based upon the

5   number of works that are infringed, and not the number of

6   infringing copies.

7       So an argument could be made that we're going to be

8   spending a lot of time fighting about this copy given to the

9   PTO for which there is some colorable justification under 1.98

10  of the PTO's rules, but it's not getting us anymore damages in

11  the case.

12      The copy that they're making for their internal use,

13  which was not required by the Patent Office rules and

14  regulations, will result in the same remedy for the plaintiff,

10:39:14  15  so why don't we just not do the work in connection with that

16  initial copy?

17          THE COURT:  Where is the line that you're drawing?

18      You're not pursuing -- although I guess now you're

19  telling me you're not conceding the propriety of the copy to

20  the PTO.  You're not pursuing, although you're not conceding

21  the propriety of one internal copy?

22          MR. DUNNEGAN:  One internal copy may --

23          THE COURT:  So beyond that, if they make a copy and

24  send it to the client, what they have submitted to the PTO,

25  that's actionable, and you're counting that as a violation?

10:39:53   1          MR. DUNNEGAN:  We would, your Honor.  We would not

2      consider that to be a fair use.  We wouldn't consider that to

3      be any different than the internal copy that they're making

4      for the following reason.

5          The arguable societal benefit from the making of that

6      copy that is arguably involved in the making of the copy going

7      to the PTO doesn't exist for the client.

8          The benefit of sending it to the client is the lawyer's

9      relationship with the client, and any obligation that exists

10     under state, not federal law, to keep the client informed.

11         So there is -- there is really no public interest in

12     submitting it to the client that would outweigh the value of

13     compensating the plaintiff for the copy that went.

14         I mean, at bottom we're talking about do they have to buy

10:40:44  15   a licensed copy, or do they get it from them for free?

16         It's not a question of can they be prevented from sending

17     it to the client.  Of course not.  My clients want it sent to

18     their client, they just want to be paid like everyone else in

19     the patent prosecution process.

20         Okay.  Now, turning to the issue of how do we prove that

21     the copies that they made, that they have admittedly made,

22     were the subject of compensation to the firm?

23         And I think that Mr. Kryder said that the way they do it,

24     and probably most law firms do it, is you send out a bill at

25     the end of a given period of time, probably a month, and it

10:41:27   1   says copies, $500 -- and I'm making this up -- and then the

2   question that we would want to learn the answer to is, is

3   there anything unusual about those copies that were made by

4   the law firm that they admittedly made that would suggest that

5   they would not be part of the charges that the law firm is

6   making in the ordinary course of events?

7       Now, I understand we may not be able to line up copies on

8   a given day with copies in a bill going out, but if the

9   ordinary practice of a law firm was to charge for all the

10  copies -- charge the client for all the copies that it was in

11  fact making in furtherance of the client's business, then it

12  would seem that would give us a very reasonable argument to

13  make to the trier of fact in this case.

14          THE COURT:  Well, but that's not the -- the evidence

10:42:24  15  is that that is not the case.  That at least one of these

16  clients had a fee arrangement that prohibited charging for

17  copies, and that it's discretionary with the lawyer.

18          MR. DUNNEGAN:  Well, it may be -- well, it's always

19  discretionary with the lawyers, because the lawyers own the

20  business.

21          THE COURT:  Well, I never thought it was

22  discretionary when I was a lawyer that I would make

23  photocopies for free?  I was -- I understood it to be my

24  obligation to charge the client.

25          MR. DUNNEGAN:  Yeah, I would think so too, but I

10:42:59  1  imagine there are instances where you just want to cut a
2  client a break, and somebody has discretion to do that.  That
3  doesn't shock me.
4      But in the ordinary course of business it's going to be
5  that the clients are charged for photocopies.
6          THE COURT:  Well, I can't --
7          MR. DUNNEGAN:  And I --
8          THE COURT:  Just a minute.  I don't think that is
9  the case.  Based upon the evidence before me it is not the
10  ordinary course of business that clients are charged.  It is
11  discretionary with the billing attorney, and sometimes they
12  are, and sometimes they're not.  That's my understanding.
13      And --
14          MR. DUNNEGAN:  But, one, we don't know the
10:43:36 15  percentage.  Is it a situation where they're not, 1 percent, 2
16  percent, 60 percent?  We just don't know.
17      The other issue that your Honor addressed was they had
18  represented that with respect to one client their arrangement
19  was that the client would not be charged for fees.
20      I believe -- my memory is that those were for the copies
21  that were 9 through 13 on their list, which they didn't
22  identify any copies for.
23      So for article 2, which is the Lee article, and article
24  7, for which there were copies made, their deal was not with
25  the client that the client would not be charged for

10:44:17  1   photocopies.  The deal was that the client would be charged

2   for the photocopies.

3        Can I tell you it's 100 percent certainty that the client

4   was charged?

5        No.

6            THE COURT:  Where are you getting the, "it was the

7   deal that the client would be charged"?

8            MR. DUNNEGAN:  That is in Mr. Kryder's papers at

9   some point.  I can't give you chapter and verse at this

10  moment.

11           THE COURT:  Well, Mr. Dunnegan, you're going to have

12  to do better than that, that, Judge, slop around somewhere,

13  and Mr. Kryder has conceded this point, that's not going to

14  do.

10:44:50 15           MR. DUNNEGAN:  Okay.

16           THE COURT:  I have got a declaration that says this

17  is a matter of discretion with the billing attorney.  That's

18  the evidence before me.

19       Even if Mr. Kryder made the statement that you're talking

20  about, that's not going to do it, but I can't rely on

21  something as vague as what you just described to me.

22           MR. DUNNEGAN:  Okay.  But even if he's saying it's

23  the discretion of the billing attorney, he's not giving us a

24  proportion of the discretion.

25       The discretion may be 2 percent, it may be 3 percent of

10:45:22  1    the time it's not charged on.

2         Our point would be that the ordinary course of business,

3    which is consistent with your Honor's personal understanding

4    that you just communicated to us, is that the client is

5    charged for the copies in the ordinary course.

6              THE COURT:  Well, I never worked at Winstead.

7    Neither did you.

8              MR. DUNNEGAN:  Well, that's correct.  But at the

9    same time do we have any reason to take on faith that Winstead

10   is going to be different than the law firms that you and I

11   have worked at, your Honor?

12             THE COURT:  Well, my news is stale, so I'm not

13   relying on anything about it, but -- I mean, I understand that

14   you don't have -- you have the evidence that you have, and I

10:46:04 15   have limited the discovery.  I understand that.

16        But I have a verification that I, contrary to the

17   argument, have concluded it's proper, telling me that the

18   facts are that there is discretion.

19        If I had you sit down -- what's the range of dates on

20   these, Mr. Kryder?  Will you remind me when -- just give me a

21   ballpark.

22             MR. KRYDER:  It basically goes from approximately

23   2010 through 2012.

24             THE COURT:  I mean, if you sat down and deposed

25   lawyers on did you make photocopy -- did you charge the client

10:46:44   1   for these three photocopies, it's impossible that anyone would

2   be able to answer that.

3        MR. KRYDER:  It was 2009.  I'm sorry, your Honor.

4        MR. DUNNEGAN:  I'm not sure, because the issue would

5   be was there a write-off?  There would be certain documents

6   coming back from the reproduction department saying the

7   charges for this client for this matter would be X, and if

8   there was not a write-off by the billing attorney from that

9   point, then it would seem to me the strong inference would be

10   that the client was charged.

11        THE COURT:  Well, I know you're hampered by my not

12   letting you do discovery, but that's not my understanding if

13   we're guessing about what was happening.

14        It's not a question of writing off, the question is not

10:47:26  15   charging for them in the first place.

16        When -- again, I can't take judicial notice of this, and

17   I'm not, but if I were as a lawyer photocopying something for

18   client business, and not charging a client for it, I would

19   have charged that to the firm in the first instance.  It would

20   never be written off.  It would never be accounted to the

21   client.  We're guessing.  That's -- I don't have any

22   information about that.

23        MR. DUNNEGAN:  Yes.  And the only thing I would add

24   is that this is their affirmative defense.

25        If they're trying to say that they didn't make a profit,

10:48:03   1    then the burden is on them.

2          THE COURT:  Well, this issue is not about making --

3    this particular question is not about making a profit.  It's

4    about whether they charged the client at all for this.

5          MR. DUNNEGAN:  I agree with that, and that's a

6    subset of the profit analysis.

7          THE COURT:  All right.

8          MR. DUNNEGAN:  Now, your Honor, I believe I have

9    addressed the concerns that you raised at the beginning.  If

10    there is anything else, I would want to address it.

11          THE COURT:  No.  Go ahead.

12          MR. DUNNEGAN:  Okay.

13       All right.  Now, the -- one point I wanted to make --

14    probably remake -- is that their fair use defense is based

10:49:09 15    upon the benefit of submitting these articles and making

16    copies of them beforehand and after hand to the PTO.

17       That does not create an inconsistency between the

18    copyright law and the patent law, because the solution is

19    obtain a licensed copy of the copyright work, and compensate

20    the copyright owner for what you are using, just as you're

21    compensating all the other people who are involved in the

22    patent application process.

23       Okay.  Now, going back to the issue -- I'll try to be as

24    fast as I can.

25          THE COURT:  No.  I'm looking because I'm thinking

58

10:49:59    1   about taking a five-minute break here.

2   MR. DUNNEGAN:  Going to the issue of Twombly-Iqbal,

3   it seems to me that the standard is, does the affirmative

4   defense appear plainly on the face of the complaint?

5   I don't think it does.

6   Second issue.

7   THE COURT:  Well, let me just say to you that the

8   strong likelihood is that I'm going to convert this to a

9   summary judgment, so you should be thinking about that.

10   MR. DUNNEGAN:  Okay.

11   THE COURT:  Implicit in that is my need to determine

12   whether what you have requested by way of discovery is

13   appropriate or a fishing expedition.

14   MR. DUNNEGAN:  Okay.  For what it's worth, the

10:50:46   15   essential discovery that we are requesting in this case is the

16   same discovery which was completed in the Minnesota case, and

17   will be completed in the Illinois case by July 15th.

18   This case isn't going to be any different in terms of the

19   discovery we seek in general form than those cases.

20   Now, should you convert it to summary judgment?

21   Here's the question that I see, and that is, this is

22   going to be so fact specific in certain instances with respect

23   to certain copies that does it pay to say, okay, plaintiff,

24   you can go off and take your discovery A, B, C, but not D, E

25   and F, because that might not be relevant to the precise

10:51:33  1    motion you're making right now.

2         I don't think in terms of judicial economy that that's

3    going to make very much sense.

4         It seems to me the proper thing to do would be to proceed

5    in the ordinary course, have discovery, and then have a

6    summary judgment motion.  That's what's happened in the other

7    two cases.

8         Now, if the Court were to -- I mean, now, should I

9    address the issue of whether there is a question of fact on

10   this record right now, or would the Court rather not?

11             THE COURT:  Sure.

12             MR. DUNNEGAN:  Okay.  Now, there are four factors

13   that the Court should consider on the fair use analysis.

14        The first is the nature and purpose of the copy.

10:52:20 15        Now, the copies that we're dealing with in this case were

16   not copies that were submitted to the Patent & Trademark

17   Office unless they were not required to be submitted to the

18   Patent & Trademark Office by its own rules.

19        So any societal benefit to the functioning of the Patent

20   Office is not going to come into play with respect to the

21   arguments -- with respect to the articles that we're talking

22   about in this case.

23        The other two important fair use considerations on the

24   first factor are the commercial nature, and the transformative

25   nature.

10:52:55  1      Let me start with the commercial nature.

2      The commercial nature here exists in two forms.

3      One would be, are they making money by charging for

4  photocopies?

5      And two, are they making money by charging hourly fees

6  for reading articles which they did not have authorized copies

7  of us -- authorized copies of?  That's the intermediate

8  commercial use that Texaco identified.

9      So it would seem to me that if you take away the benefit

10  or the obligation to comply with the PTO regulations, which

11  doesn't exist for these copies, and you weigh the commercial

12  use and the non-transformative use, you come to the conclusion

13  that factor one would favor a finding of infringement.

14      THE COURT:  Well, how can they be required to submit

10:53:49  15  relevant prior art to the PTO without reading it?

16      In your other case you are apparently complaining that

17  they did just that.  Presumably they can't be in good faith in

18  submitting prior art that they didn't read.  So if you're not

19  claiming that the submission to the PTO is a violation, how

20  can it be improper for them to read the article that they are

21  submitting?

22      MR. DUNNEGAN:  Because they could go to aip.com, or

23  wiley.com (sic), and pay for a licensed copy of the article

24  which they read, that would be entirely profit --

25      THE COURT:  It's just -- this is completely

10:54:28   1   inconsistent, Mr. Dunnegan.  I don't understand the point.

2        If you're not complaining about submission of the

3   articles to the PTO, you can't possibly complain that there is

4   a commercial purpose that renders the fair use defense

5   improper because the lawyers read it.

6        They have to read it.  It's impossible for them to be

7   able to submit something to the PTO that they didn't read.  So

8   if they didn't submit it to the PTO without infringing on your

9   client's copyright, then they can read what they submitted to

10   the PTO.

11        MR. DUNNEGAN:  In order to engage in the analysis

12   your Honor just did, I think you have to make a distinction

13   between a copy which was authorized, and a copy which was not

14   authorized.

10:55:10  15        Let's start with the authorized copy.

16        If the attorney is told that article by Lee entitled

17   something else is relevant prior art, then the proper thing to

18   do is for the attorney to obtain an authorized copy of the

19   article from the publisher or a document delivery service, pay

20   about $30 to get a licensed first copy, read that.

21        If the lawyer then determines that it's appropriate to

22   submit to the Patent & Trademark Office, then we're not

23   complaining about the next copy that was given to the Patent &

24   Trademark Office either electronically or on paper.

25        Nor are we complaining about the additional copy from

10:55:52  1    that, which there wasn't a license for, that they put in their

2    file to memorialize that.

3        What we are complaining about is a situation where they

4    never had a licensed first copy to begin with.  Either they

5    took it off the Internet, or they got it from a client who

6    didn't have authority to give it to them, or another patent

7    practitioner who didn't have authority to give it to them.

8    Then they make a copy, and they read the unauthorized copy.

9        That's intermediate use of an authorized copy, which

10   should not be fair -- which should not be considered as fair

11   use, because it's commercial under the Texaco case assuming

12   all the other factors are as in the Texaco case.

13       THE COURT:  Let's take a five-minute recess here,

14   and then pick up where you want to.

11:05:05  15   (Brief recess.)

16   (Judge enters courtroom.)

17       MR. DUNNEGAN:  I'm sorry.

18       THE COURT:  You're not late.  Our clocks are all

19   messed up.  Just pick up where you were.

20       MR. DUNNEGAN:  Before I -- I would like to go back

21   to something I couldn't provide earlier, and that was the

22   number of articles for which they had the agreement that the

23   client was not charged.

24       I'm looking at their opening brief on this motion,

25   document 56 at page 12 of 16, which repeats their

11:05:34  1  interrogatory answers.  And in the middle of the page it just

2  says, "Winstead's engagement with the clients on those patent

3  applications and prosecutions included articles 9 through 13

4  on Exhibit A, which expressly provided that the client would

5  not be charged for the photocopies."

6     So by negative inference it appears that for the clients

7  identified on articles 1 through 8 there was an agreement that

8  the client would be charged for the photocopies.

9        THE COURT:  Absolutely not.  Completely inconsistent

10  with the declaration.  9 through 13 would not be, 1 through 8,

11  billing discretion.

12        MR. DUNNEGAN:  Exactly.  Exactly.  But -- I'm sorry.

13  The point I was trying to make is that the agreement with the

14  client is that for 1 through 8 the client would be charged

11:06:19  15  under the agreement with the client.  If the attorney for some

16  reason decided to give the client a break, well, the client

17  got a break.  But in the ordinary course of business law firms

18  will occasionally give clients a break, but not all the time.

19        THE COURT:  All right.

20        MR. DUNNEGAN:  Now, I believe we were starting to

21  talk about transformative use.

22     Transformative use generally means that you're doing

23  something different to the work.  Like in the Campbell case,

24  they were taking the Roy Orbison song and turning it into a

25  song about a streetwalker.  That's transformative.

11:06:57  1      In this case they're just making a photocopy, as in the

2      Texaco case, as in the Princeton case.  In both of those cases

3      the Second Circuit and the Sixth Circuit en banc said that the

4      making of the identical copy was not transformative.

5          In fact, in the Sixth Circuit case, Princeton, the copies

6      were being cut up and put into horse books so that there would

7      be a number of articles or works assembled into the same

8      document.

9          That still didn't make it transformative, because they

10     weren't doing anything with respect to the particular article.

11         Now, transformative could also mean it's put to a

12     different use.

13         For example, the leading case on this is a Fourth Circuit

14     case involving the Turnitin Software whereas you make a copy

11:07:43  15   of an article to figure out whether or not it has been

16     plagiarized.  That's not really using the article for its

17     content.

18         There are additional cases.  The Perfect 10 case, the

19     Bill Graham case in the Second Circuit deal with making the

20     reproduction of the work so small that it really doesn't have

21     the commercial appeal of the initial work.

22         That's not what's happening here.  The best they can say

23     is that, well, this -- these articles are used not to allow us

24     to learn the subject matter, but to have evidence of what the

25     state-of-the-art was.

11:08:29  1    Well, at best for them that's just a subset of the

2    purpose for which these articles were originally written.

3        These articles were written, and there is evidence in our

4    initial documents from the declarations of Susan Braley and

5    Christopher McKenzie that these articles are published to

6    inform people of the state-of-the-art.

7        The state-of-the-art consists of what experiments were

8    done, what was known from those experiments, and that's what

9    the patent lawyers may primarily be interested in, but it's

10   going to be the same purpose -- it's going to be a subset of

11   the same purpose for which the article was originally

12   published by my clients.

13       So for that reason they're using the content for a subset

14   of the purposes.  I don't think that comes close to what was

11:09:19  15   intended in Campbell to be transformative use.

16       Now, that's factor one.

17       If we couple the non-transformative use with the

18   commercial element, the profit at least through reading the

19   unauthorized copies, and then the lack of a public interest by

20   the lack of a need to file that particular copy with the PTO,

21   it seems factor use is going to favor a finding of no fair

22   use.

23       THE COURT:  All right.  One more -- I'm going to

24   take one more shot at this.

25       MR. DUNNEGAN:  Okay.

11:09:51 1      THE COURT:  Someone is giving you marching orders

2  about what copies to pursue in this litigation, but you're

3  taking the position that if all we had here was a copy, not

4  licensed, not paid for, furnished to the Patent & Trademark

5  Office with a patent application, never copied by anybody

6  else, never sent to the client, that that copying is or is not

7  fair use?

8      MR. DUNNEGAN:  It's not part of the amended

9  complaint.  If the copy -- the hypothetical, as I understood

10  it that you just gave, no one made a copy.  It was just a copy

11  appeared, and it was given to the Patent Office.

12      Now, in that case, there is no prima facie case.

13      THE COURT:  No.  I'm asking you to assume a copy was

14  made.

11:10:42 15      MR. DUNNEGAN:  Okay.  So the law firm makes one copy

16  without any authorization, gives that copy to the Patent

17  Office, and in the process makes another copy --

18      THE COURT:  No.  Take the hypothetical that I'm

19  giving you.

20      I'm pressing you on this because I don't -- I still don't

21  understand the principal distinction you're making between the

22  various sets of copying.

23      The copy furnished to the PTO, that's it.  Assume no

24  other copies.  One copy made, sent to the PTO with the notice,

25  attached to the notice, no other copies made, didn't pay your

11:11:23  1   client, didn't have a license, made a copy, sent it on as

2   prior art.

3       Actionable or not?

4           MR. DUNNEGAN:  We're not pursuing it.

5           THE COURT:  I don't care whether you're pursuing it.

6   I want to understand the argument.

7       Is that fair use, or you don't know, you're just going to

8   punt?

9           MR. DUNNEGAN:  One way it would not be fair use, or

10   if it was -- if we're dealing hypotheticals, if it was an

11   article about concrete, and the patent was about brain

12   surgery.

13           THE COURT:  Okay.

14           MR. DUNNEGAN:  Put that aside.

11:11:55 15       If it was reasonably required to be filed, I couldn't

16   give you any more than my personal opinion.  Our client is not

17   taking a position on that.

18           THE COURT:  Well, if it's not actionable, it must be

19   transformative, because if it's not transformative, how is it

20   not actionable?

21           MR. DUNNEGAN:  Because of the justification -- not

22   transformative, but the societal benefit of complying with the

23   PTO regulation with respect to that one copy.

24           THE COURT:  Where does that societal benefit

25   analysis come in?  What factor in the fair use analysis is

11:12:33  1    that?

2                    MR. DUNNEGAN:  It would be factor one, the nature or

3    purpose of the use, I imagine.

4                    THE COURT:  As I read the case law, the nature and

5    purpose of the use, and the analysis of whether or not it is

6    transformative is one and the same.

7                    MR. DUNNEGAN:  Yes.  The way I understand the case

8    law is -- in your Texaco case or your Princeton case, the

9    first inquiry is, is it commercial?

10           Your second inquiry is going to be is it transformative?

11           And in this case we have another boomerang, which is the

12    PTO regulation requiring material prior art to be submitted,

13    although not unlicensed material prior art.

14           Okay.  But that's where I would fit it in.

11:13:14  15           The other way theoretically to fit it in is that these

16    four factors do not have to be exclusive, you know.  You can

17    look at the totality of the facts and circumstances.  So even

18    if I'm wrong about whether or not it fits into fair use number

19    one -- excuse me -- factor number one, you know, we're not

20    telling that -- we're not saying that it should be ignored.

21                    THE COURT:  Okay.

22                    MR. DUNNEGAN:  Now, moving on to --

23                    THE COURT:  One more question, because I have

24    interrupted you.

25                    MR. DUNNEGAN:  Sure.

11:13:48  1          THE COURT:  On the foreign patent prosecution, I

        2  don't remember, I'm sure I have it here, maybe I don't, was it

        3  divulged in the answers what foreign authority?

        4          MR. DUNNEGAN:  No.

        5          THE COURT:  Mr. Kryder, I have -- I don't want you

        6  to answer this now, but when you come back on rebuttal I want

        7  you to.

        8      I know nothing, so I'm really speculating about, you

        9  know, if this is in Germany, I have no idea what is required.

       10  I don't know anything about whether prior art is required to

       11  be submitted.

       12      I mean, we're looking at -- you're making this argument

       13  about the quasi-judicial authority, I know nothing about it.

       14      So it's a little bit troublesome to go through the

11:14:37 15  analysis of the four factors with respect to the foreign

       16  prosecution because I don't have any of the facts about it.

       17      With respect to the PTO, I believe I can take judicial

       18  notice of what the PTO does.  I think I can take judicial

       19  notice about it.  I also have got evidence about that.

       20      But with respect to the foreign authority I don't know

       21  who the authority is, nor do I know what the authority

       22  requires.

       23      Just a minute.

       24      (Off the record.)

       25          THE COURT:  All right.  Thank you.

11:15:04   1         MR. DUNNEGAN:   Your Honor, just to follow up on

2    that, it's not disclosed in the answers to the interrogatories

3    that they gave us.

4              THE COURT:   Okay.

5              MR. DUNNEGAN:   Now, factor number two -- well,

6    before I leave factor number one, factor one has to be

7    analyzed for each of the copies that they made.

8         The foreign copy -- the copy to the foreign patent

9    associate has a different factor one analysis than the copy

10   that was made to put on their document management system, if

11   that was going to in fact be the archival copy, or duplicate

12   archival copy.

13        Going on to factor number two, which is the nature of the

14   copyrighted work, in this case we're dealing with scientific

11:16:13  15   articles.   There is no dispute that there is enough creativity

16   in them in order to meet the copyright standards.

17        The issue is how does a scientific article play in with

18   the work of fiction along this line, and I would suggest that

19   if we look at article one --

20             THE COURT:   Let me stop you on that.

21        I'm not buying that argument by the opposition that the

22   scientific article is not like a poem.   I mean, it's an

23   original creative work.   The fact that it is hard science

24   doesn't mean it's not, so I think it is such a copyright.   I

25   don't think it gets a lighter touch because of it.   So you win

11:16:50  1    that.

2              MR. DUNNEGAN:   Okay.   Thank you, your Honor.

3         Let me -- let me just clarify to make sure that we are

4    not confused between us.

5         I don't think that they have argued that it's not subject

6    to copyright.   I think they are just saying on the scale of

7    factor two --

8              THE COURT:   Yes, they are, and I don't agree with

9    that.

10             MR. DUNNEGAN:   Thank you, your Honor.

11        Now, with respect to factor -- with respect to factor

12   three, that's the extent to which they are copying the

13   copyrighted article.   And for all the copies that we're doing

14   here, from what I can tell based upon the limited disclosure

11:17:25 15   that they have made, these articles are being copied in their

16   entirety.

17             THE COURT:   Yes, you may assume that for the purpose

18   of this hearing.   I'm assuming that.

19             MR. DUNNEGAN:   Okay.   So factor three -- factor

20   three probably favors the plaintiff, and at best cannot favor

21   fairness.

22        So moving on to factor four, which is the effect of the

23   use on the plaintiffs' business on the market value on the

24   loss of revenue.

25        In that respect what we're claiming is that for the

11:17:59   1    copies they made, revenue was lost by the plaintiff.  That is

  2    arguably the most important fair use factor.

  3             THE COURT:  Go ahead.  I'm looking for something on

  4    this case.

  5             MR. DUNNEGAN:  Okay.  Now, in this case when they

  6    obtained an unauthorized copy as their first copy, they could

  7    have gone to aip.org or wiley.com and obtained in a few

  8    minutes for about 30 bucks an original first copy of the

  9    article that they were dealing with.

  10      Now, that deprived the publisher directly of revenue if

  11    they did it that way, or they could have gone to a document

  12    delivery service and obtained a copy, which the document

  13    delivery service would pay the copyright fee on.

  14      Again, we're talking about minimal resources in order to

11:18:58  15    obtain these first licensed copies.

  16      Now, once they have their first licensed copies, they

  17    have a couple of options available to them to make other

  18    licensed copies.

  19      Now, the most typical is for a law firm to buy what's

  20    called an annual copyright license from the Copyright

  21    Clearance Center.  What that does is for about 300 -- about

  22    300 bucks per lawyer, per professional, per firm, someone --

  23    anyone in the organization has the right to make an unlimited

  24    number of internal copies as that's defined in the agreement.

  25             THE COURT:  Let me stop you for a minute, because I

11:19:42  1   may be operating under an assumption that's not correct.

2        Are these articles subject to obtaining for purposes of

3   reading them without making copies?  Can I access these

4   without paying a dime to read them?

5            MR. DUNNEGAN:  Can you access them without paying a

6   dime?

7        No.

8            THE COURT:  So they're not in the -- they're not

9   available in a library?

10           MR. DUNNEGAN:  Oh, I'm sorry.  Yes.  Yes.  But over

11   the Internet -- I mean, if someone is an alumnus of the

12   University of Texas, or whatever library, and you had a card

13   to go in, someone can go read these off the shelf.

14           THE COURT:  So it isn't the reading of them.  It is

11:20:28 15   the copying of them?

16           MR. DUNNEGAN:  Under -- it is the copying under

17   106.1, which is prohibited.

18        When you get to the analysis of the fair use analysis

19   under 107, is it commercial, is it noncommercial, how much

20   benefit did they get out of it, then it's appropriate for the

21   Court to consider how much money they made reading the

22   unauthorized copy.  That's the Texaco case.

23           THE COURT:  Okay.

24           MR. DUNNEGAN:  Now, factor -- I was starting to talk

25   about the Copyright Clearance Center, and what an annual

11:21:06  1  license from the Copyright Clearance Center for about 300

2  bucks per professional at the firm allows you to do is to make

3  an unlimited number of internal copies for your own use.

4      If the Winstead firm had a -- had a CCC license, it's a

5  virtual certainty that this case would not have arisen.

6      So at the end a good portion of the fair use analysis is

7  going to boil down to the question should Winstead be required

8  to pay for the copies that it makes, or should the publishers

9  subsidize Winstead's patent prosecution --

10          THE COURT:  You really don't want to pronounce their

11  name correctly?

12          MR. DUNNEGAN:  I'm terrible.  I really am.

13          THE COURT:  Winstead.

14          MR. DUNNEGAN:  Winstead.  I really practiced that

11:21:55 15  before today's argument.

16          THE COURT:  You could have fooled me.

17          MR. DUNNEGAN:  I very well --

18          THE COURT:  I took you to school last time, and it

19  didn't take.

20          MR. DUNNEGAN:  You did.  And some people never

21  learn, and I'm one of them, I guess.

22      But anyway, going back to factor four, does the plaintiff

23  have to subsidize the defendants' patent prosecution practice?

24      It seems to me important to realize that no one else

25  subsidizes that practice.

11:22:22   1    If Winstead needs the paper to make a copy from, it has
         2    to go to Staples or some other store and buy the paper.
         3         If it needs a computer on which to word process the
         4    application, it has to go to Dell, or some other computer
         5    company, to buy the computer.
         6         It can't say I'm using this in connection with patent
         7    prosecution practice, I'll take it for free, thank you.
         8         We don't think that the publisher should be treated any
         9    differently simply because the property they own is
        10    intellectual property.
        11         So that's where I would come out on the fair use analysis
        12    if it was left up to me, and at the end of that what we're
        13    left with is these four factors, some of which may go one way,
        14    some of which defendants argue go the other way, but there is
11:23:06 15    a balancing at the end of them considering all the facts and
        16    circumstances in the case.
        17         That's true even if the Court adopts the PTO standard of
        18    necessary and incidental, because they admit the necessary and
        19    incidental inquiry is just, well, under all the facts of the
        20    case, is it necessary and incidental?
        21         That inquiry where factors are pointing in different
        22    directions is generally done by the trier of fact as a mixed
        23    question of law and fact.
        24         It is conceivable, like the Brownmark case that
        25    Mr. Kryder mentioned in his papers, could go as nonfair use as

11:23:52  1    a matter of law.

2         It's also just as likely that, for example, in the

3    Minnesota case we're arguing that the copies that were made

4    for foreign patent prosecution cannot be fair use as a matter

5    of law -- cannot be fair use as a matter of law.  Those are

6    infringements as a matter of law.

7         And on the extremes you can generally -- it's possible

8    for it to have a question on which no reasonable person can

9    disagree, but in the middle where you are having facts which

10   are moving one way or the other, and are subject to dispute

11   among the evidentiary facts, then it's generally -- generally

12   going to be a question for the trier of fact or a jury for

13   determination.

14        Fair use is generally not well suited for summary

11:24:41  15   judgment except in the very, very rare cases.

16        Judge Posner said that in the Beanie Babies case.

17        Now, I think we have -- that's why I think that on the

18   record right now there is at an absolute minimum a question of

19   fact with respect to everything except the foreign copies.

20             THE COURT:  All right.  Mr. Dunnegan, I want to make

21   sure that -- I want to exclude the foreign copies issue from

22   this question.

23        Apart from that, to the extent I have allowed you this

24   limited discovery, you're putting forward what you claim

25   establishes a fact question from the discovery that you have

11:25:29   1    obtained so far.  And you have set out in your declaration

2    filed March 14th what additional discovery you would conduct

3    if I treat this as a summary judgment, and gave you the

4    opportunity to conduct additional discovery.

5        Yes?

6            MR. DUNNEGAN:  Yes.

7            THE COURT:  Okay.  Very good.  Thank you.

8        Mr. Kryder.

9            MR. KRYDER:  Your Honor, I heard counsel say about

10   his positions on the extremes.  That's exactly what they are,

11   positions are extreme, and discovery isn't going to make them

12   less so.

13       The Court at the last hearing said that the discovery

14   that they were asking for is the original definition of a

11:26:17   15   fishing expedition.  It's exactly what they are seeking.

16       You can tell, your Honor, from the sworn interrogatory

17   answer of Mr. Campbell on behalf of Winstead that all of the

18   copies -- well, first of all, there are only three

19   photocopies.  So there is no need for discovery.  There is no

20   evidence that anyone charged it -- there will be no evidence

21   that any client was charged for it, and at most you're talking

22   about a few dollars for three articles.

23       The Court mused whether law firm billing practices maybe

24   were a little bit dated.  These days a lot of clients, your

25   Honor, insist that we not charge for long distance telephone

11:27:02  1    calls, for faxes, for copies, and many of them insist on caps

2    on copies.  It's the way law practice is today.

3         But the fact is, as set forth in our -- in the appendix,

4    pages 195 through 196, they don't need discovery concerning

5    Winstead's per-page cost, because we already know no client

6    was charged for it.  There will be no such -- no discovery

7    would prove anything else.

8         They say they need discovery about who worked on the

9    applications in discovery concerning their hard drives.

10         Again, your Honor, the sworn interrogatory answer at

11    supplemental appendix 133 and 194 shows that lawyers did not

12    maintain copies of these articles on their respective computer

13    hard drives, or in locations other than client files.

14         While Mr. Dunnegan may find that hard to believe at his

11:27:58  15    law firm, or in other hypothetical law firms that he knows

16    about, there are many law firms, including Winstead, which

17    lock down the ability of lawyers and staff to be able to save

18    anything on their hard drives.  Discovery will not show

19    anything differently.

20         One of the things that Mr. Dunnegan said a few minutes

21    ago was that with respect to discovery, quote -- this was

22    about 10:32 a.m. if you look at the recording -- "We cannot

23    know, because it's in a black box protected by privilege."

24         That's what they're looking for.  They want to take the

25    deposition of somebody at Winstead.  They say they seek

11:28:41  1    discovery concerning Winstead made an indirect profit.

2         "Discovery concerning these issues would begin with

3    Winstead's internal billing records, and continue with the

4    deposition of the personnel who billed that time, and would

5    continue with Winstead's invoices to its clients for

6    disbursements in connection with those applications."

7         Their position is you can submit an article to the PTO

8    and it's fair use apparently.

9              THE COURT:   Maybe?

10             MR. KRYDER:   Maybe yes and maybe not.

11             THE COURT:   Mr. Dunnegan is dancing around that

12   question.

13             MR. KRYDER:   So maybe it is --

14             THE COURT:   Wait.  Wait.

11:29:17  15    He's dancing around that question, which I have asked him

16   repeatedly, because in his heart he thinks there is no

17   distinction, but his client is making him argue otherwise.

18        So he's not conceding that that's a fair use, in his gut

19   he thinks it's not, but he doesn't want to answer because he's

20   not arguing about it here.

21             MR. KRYDER:   Right.

22             THE COURT:   You don't have to respond, Mr. Dunnegan.

23   I'm reading your mind here from on high.

24             MR. KRYDER:   On the other hand, if it -- if he might

25   not be contesting here the article that goes to the PTO has to

11:29:53  1    have been read, reviewed and analyzed by any number of lawyers

2    who were -- or staff who are working on the engagement to

3    decide whether it must be disclosed, the client also needs

4    to -- the inventor, who is on the application, also needs to

5    review that document.

6         Their position is that you can't send a copy to the

7    client even though the client, who is the inventor, may have

8    his own duty to disclose obligations to the PTO.

9         His position is you can't provide a copy to anyone else

10   in the firm even if they are prosecuting the patent.  You

11   can't bill for reading the article to decide whether it must

12   be submitted.

13        If you have a legal duty to submit it to the PTO and to

14   analyze it and to be able to respond when the PTO has office

11:30:47 15   actions, you certainly have to be able to do that.

16        This profit by intermediate use based on the Texaco case,

17   this is not the Texaco case.  In that case they didn't have

18   discovery to say whether every one of these -- how much money

19   each of these scientists made by the hour.  The difference

20   between Texaco and here, it wasn't a quasi-judicial proceeding

21   where the lawyers had a duty to submit these articles as

22   evidence of prior art.

23        No amount of discovery is going to change the undisputed

24   fact, your Honor, that Winstead didn't charge for digital

25   copies.  The e-mails that were distributed were to team

11:31:31   1   members, with the exception of the foreign co-counsel.

2           The Court asked about that.  That's in our interrogatory

3   appendix, supplemental appendix at page 201.

4           The Court asked, and I do not recall, and I don't have

5   the document here, what specific country or countries --

6                   THE COURT:  Well, I just don't have anything to

7   reference.

8                   MR. KRYDER:  So I don't know -- or -- or what

9   authority was being prosecuted.

10          My understanding, however, is that most foreign Patent

11  Offices have similar duties to disclose prior art that you do

12  in the United States.  And indeed --

13                  THE COURT:  I can't take judicial notice of that,

14  Mr. Kryder.  I don't even know what country you're talking

11:32:14  15  about.

16                  MR. KRYDER:  Well, in almost any country the --

17  where lawyers are prosecuting patents, I think the Court could

18  take judicial notice, but perhaps won't, that the obligations

19  are the same.

20                  THE COURT:  Well, I won't.  I mean, it has -- you

21  have to give me something.

22                  MR. KRYDER:  Sure.

23          In any event -- in any event, providing a -- one e-mail

24  to two foreign co-counsel prosecuting a related foreign

25  counterpart application on article number two can't be any

11:32:48  1  different than the PTO.  The obligation is -- we would submit

2  is the same, if that's really what the only hang-up is.

3      I would emphasize, your Honor, that there are only three

4  paper copies that were involved that are in the hard copy

5  files.  No amount of discovery is going to change the fact

6  that there is no indication that anyone was charged.

7      About this 18 cents a copy, it ranges all over Dallas in

8  terms of what the copy costs are.

9          THE COURT:  I'm not going to go there, Mr. Kryder.

10         MR. KRYDER:  Okay.  The final thing here is that you

11  can go get this article and read it at the library.  Lawyers

12  can be billing for that.  You can get a copy at the PTO.  You

13  can go buy a copy there.  You don't have to pay the publisher

14  for that.

11:33:40  15     The distinction is that because when it's submitted to

16  the PTO, or it's on the continuum going to the PTO, it's fair

17  use and it's transformative.  That's the only way that they

18  can agree, or at least in this case, not contend that there is

19  a lack of fair use by submitting it to the PTO.

20     The final thing, your Honor, here is, this is not copy

21  paper that Winstead is buying at Staples.  It's a document

22  that both Winstead and its client had a legal duty to find, to

23  read, to analyze, and to submit to the PTO.  And the fact that

24  multiple people are reading it and reviewing it pursuant to

25  the practice of law doesn't change its fair use character.

83

11:34:24  1      Unless the Court has any further issues, we would

2      respectfully urge the Court to grant our motion.

3          Alternatively, to convert it to a Rule 56 motion.

4          We don't think there is any need for discovery.  If the

5      Court were inclined to allow any, we would urge that it be

6      extremely narrowly contoured, because the only issue they have

7      pled in the amended complaint is Winstead making a profit on

8      photocopies, and there will be no discovery that shows

9      anything to the contrary.

10         Thank you, your Honor.

11             THE COURT:  All right.  Thank you.

12         All right.  I appreciate the fine argument.

13         Did you have anything else you wanted to add?

14             MR. CASAGRANDE:  Just one narrow point, your Honor.

11:35:09  15     I understood Mr. Dunnegan to say that on the second

16     factor, the nature of the copyrighted work, he thought it was

17     enough that there was a significant amount of creative

18     expression in this factual work, and for that reason, he

19     thought that favored him in the fair use analysis.

20         I would just simply point out to the Court that that

21     formulation of the second factor is broader than what the

22     Fifth Circuit has recognized in the Compaq versus Ergonome

23     case, which we cited in our initial moving papers, which said

24     that it's not simply whether it's got a significant amount of

25     creative impression, it really is a test between fantasy and

11:35:48   1    fiction on the one hand, and something that's factual in

2    nature on the other, because otherwise copyright ability would

3    swallow the fair use defense.

4         Thank you, your Honor.

5              THE COURT:  Well, I appreciate the point you're

6    making.  I may have stated my point a little more broadly.

7         It's not that it isn't subjected to protection,

8    obviously, because it is, it's creative impression, but

9    because it has a use in and of itself, that a work of fiction

10   is not, it has to be treated somewhat differently.  I think

11   that's the point you were making.

12             MR. CASAGRANDE:  Yes.

13             THE COURT:  A poem, for example, is -- it's value is

14   as a creative expression only, not to allow one to calculate

11:36:38  15   how many widgets would fit into a cube, and this has a

16   creative purpose, and which would allow it to be used for a

17   transformative purpose, among other things.

18        I know that's a different factor, but it allows it to

19   have other uses beyond its mere creativity.

20             MR. CASAGRANDE:  Are you talking about the

21   scientific article?

22             THE COURT:  Yes.

23             MR. CASAGRANDE:  I suppose that it could, but in

24   this instance it's clearly being limited to --

25             THE COURT:  Yes, I understand.  A purpose beyond a

11:37:09   1  mere expression.

2          MR. CASAGRANDE:  Yes.  Thank you, your Honor.

3          THE COURT:  I understood that, and I understand that

4  point.  It isn't necessary for me to determine where it fits

5  on the scale, except to say it is a creative work of

6  expression.

7      That was the point that I was making in agreeing with

8  counsel for the plaintiff, but it does as well as express

9  itself creatively, it also has purposes beyond the mere

10  creative expression.

11          MR. CASAGRANDE:  Yes, your Honor.

12          THE COURT:  All right.  I appreciate the fine

13  argument, and I regret -- and I think I am responsible for --

14  by my comments -- suggesting that I think this thing could be

11:37:52  15  resolved on motion to dismiss.  I think it can't be, because

16  inevitably what actually transpired here is being argued by

17  the party.

18      So I am converting this to a Rule 56 motion.

19      I'm converting both the 12(b)(6) that was filed by

20  Winstead, and the 12(c) motion that was filed by the PTO.

21      That requires the Court to address whether it is

22  reasonable for me to proceed on the current record, or whether

23  I should allow additional discovery for the plaintiff.

24      I have reviewed the appendix B, Mr. Dunnegan's

25  declaration describing what additional discovery is required.

11:38:39   1        The Court is of the view that the discovery that is

2    described here is neither reasonable nor necessary nor

3    appropriate, and is in effect a fishing expedition of the same

4    characterization that I gave to it earlier.

5        I am satisfied that the state of the record allows the

6    Court to go forward on the summary judgment with the exception

7    of the foreign -- the copies for foreign attorneys.  I don't

8    know enough about that to rule on that.  I don't have enough

9    evidence in the record.

10        Mr. Dunnegan, I'm going to rule against you on fair use

11    on everything but that.  I will write an opinion that explains

12    my analysis of the four factors.  So I am allowing you to

13    conduct discovery with respect to the copies for foreign

14    lawyers, but let's be realistic here about the time, effort

11:39:42  15    and energy associated with that.

16        In the Court's view that is a sideshow here that you

17    happened upon in connection with the discovery here.

18        I'm going to direct the parties to confer about what they

19    might do to develop the record factually so all of these

20    issues can go up on appeal together, rather than have a lot of

21    discovery that is a sideshow on the foreign communication.

22        If Mr. Kryder is able to convince me that with respect to

23    the particular patent authority that the nature of the

24    requirement in terms of submitting prior art is similar to

25    what is required by the PTO, it is very likely that the Court

11:40:37  1    will conclude that providing copies to lawyers assisting in

       2    the prosecution of related patents under a jurisdiction that

       3    has a similar regime to that of the PTO will also be found by

       4    me to be a fair use.

       5        I will reserve the issue of attorney's fees sought by the

       6    defendants until the issue of the foreign communications is

       7    resolved.

       8        It -- if I grant the converted motion for summary

       9    judgment on fair use for Winstead, I assume that moots the

      10    PTO's 12(c) motion.

      11              MR. CASAGRANDE:   Yes, your Honor.

      12              THE COURT:   All right.   I will flush out in my

      13    written opinion my analysis of the four factors, but the Court

      14    is of the view that the record with respect to the number of

11:41:39 15    copies made, the purpose for the copies, the lack of evidence

      16    and the inability to develop evidence as to how -- whether any

      17    clients were ever charged for any copies of these documents,

      18    the limited number of copies, and the use of the copies for

      19    purposes associated with the prosecution of the patent

      20    establishes as a matter of law fair use under Rule 56, and

      21    that will be the Court's ruling.

      22        Are there any other issues that either party wants the

      23    Court to comment on today?

      24        Yes.

      25              MR. DUNNEGAN:   Your Honor, I understood that our

11:42:21   1   motion for summary judgment with respect to the PTO's

2   counterclaim was going to be considered today based upon an

3   e-mail that I received from the Court last evening.

4         THE COURT:  Well, I'm denying it as moot.

5         MR. DUNNEGAN:  Okay.

6         MR. KRYDER:  Your Honor, just one issue.

7      The Court indicated with respect to what is hopefully

8   extremely narrow concerns only one e-mail.

9         THE COURT:  I'm going to direct you all to confer.

10   If you're not able to work out an agreement on how to tee this

11   issue up for me, then if you can't reach agreement, then you

12   will notify my clerk, I'll have a conference call with you,

13   and I'll tell you how to tee it up.

14         MR. KRYDER:  All right.

11:43:00  15         THE COURT:  Is that what you were asking?

16         MR. KRYDER:  Well, the Court indicated that if the

17   regime is similar, for example, as the UK Patent Office, and

18   they do everything exactly like the PTO, I don't know --

19         THE COURT:  The record needs to be a little bit more

20   precise.

21      Copies were furnished to who in connection with what

22   under what particular regime, and what is the law with respect

23   to that regime.  Those are the things that I think are to be

24   teed up.

25      If Mr. Dunnegan has other issues that he thinks are

11:43:35  1    germane to that issue -- Mr. Dunnegan, I know you're going to

2    appeal this, and I welcome you to do that.  I just -- I think

3    it is a waste of your time and energy and your clients' money

4    to go too far down the road with this one, rather develop the

5    record as you need, and then take them all up together.

6         I don't think you would have filed this case if it were

7    limited to there who two copies sent to some foreign lawyer

8    in a place we don't know, but maybe you would.  I don't know.

9         Let's develop the record.  I'm going to rule consistent

10    unless there is some reason to rule otherwise, and then you

11    can have your appeal on all of them.  Right now you have just

12    got an interlocutory order.

13         All right.  Anything else for today?

14         (No response.)

11:44:24  15         THE COURT:  Interesting issues.  Thank you for the

16    very good argument.

17         Okay.  Y'all may be excused.  Thank you.

18                       ---oOo---

19

20

21

22

23

24

25

90

1

# *C E R T I F I C A T E:*

2

    I, P. Sue Engledow RPR/CSR, certify that the foregoing is
3  a transcript from the record of the proceedings in the
foregoing entitled matter.
4     I further certify that the transcript fees format comply
with those prescribed by the Court and the Judicial Conference
5  of the United States.
    This the 29th day of May, 2013.
6

                        */S/P. Sue Engledow*
7

8

9                P. SUE ENGLEDOW RPR/CSR No. 1170
Official Court Reporter
10               The Northern District of Texas
                 Dallas Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25