**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| AMERICAN INSTITUTE OF PHYSICS, AND BLACKWELL PUBLISHING, LTD. | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| WINSTEAD PC AND JOHN DOES NOS. 1-10, | § § | |
| Defendants, | § § | CIVIL ACTION NO. 3:12-CV-1230-M |
| and | § § | |
| THE UNITED STATES PATENT AND TRADEMARK OFFICE, | § § § | |
| Intervening Defendant and Counterclaim Plaintiff. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion to Dismiss Plaintiffs' Amended Complaint, filed by Defendants Winstead PC and John Does Nos. 1–10 (collectively "Winstead" or "Defendants") [Docket Entry #56]. John Does Nos. 1-10 are partners, associates or other employees of Winstead, whose identities are not known to Plaintiffs. Pursuant to Federal Rule of Civil Procedure 12(d), the Court converted the Motion to Dismiss to a Motion for Summary Judgment during the hearing held on May 22, 2013. After considering the parties' arguments, the factual record developed through limited discovery, and applicable law, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case is a copyright infringement action brought against Defendants for alleged unauthorized copying and/or distribution of Plaintiffs' copyrighted works. Plaintiffs are publishing

corporations that produce scientific, technological, and medical journals. Winstead is a law firm whose practice includes preparing patent applications for submission to the United States Patent and Trademark Office ("USPTO").

On April 20, 2012, Plaintiffs filed suit for copyright infringement, because two academic articles ("non-patent literature" or "NPL") were allegedly copied by Defendants as part of their patent prosecution practice. *Pls.' Compl.* at 3–4 [Docket Entry #1]. Defendants moved to dismiss Plaintiffs' Complaint, claiming an affirmative defense of fair use pursuant to 17 U.S.C. § 107. *Defs.' Original Mot.* at 5–14 [Docket Entry #13]. At a hearing held on November 20, 2012, the Court granted Defendants' Motion to Dismiss, but permitted Plaintiffs to file an amended complaint after receipt of responses to interrogatories on the extent of Defendants' copying. [Docket Entry #42].

Plaintiffs filed their Amended Complaint on November 27, 2012, claiming infringement of thirteen NPL articles. *Pls.' Am. Compl.* at ¶¶ 14, 21 [Docket Entry #44]. However, Plaintiffs did not reassert claims for copies made for submission to the USPTO. Plaintiffs' Amended Complaint asserts that their claim of unauthorized copying does not include: (a) copying of copyrighted NPL for submission to the USPTO as required by federal regulations, (b) transmitting such copies to the USPTO, or (c) making one archival copy of NPL for Defendants' internal files, memorializing submission to the USPTO . *Id.* at ¶ 1. Defendants filed another Motion to Dismiss the Amended Complaint, reasserting the affirmative defense of fair use, reincorporating the arguments from their original Motion to Dismiss. Finding the factual record sufficient, at the hearing of May 22, 2013[1], the Court denied Plaintiffs' request for additional discovery and

---

[1] At the hearing, the Court concluded that additional discovery requested by Plaintiffs was not necessary or appropriate. Hr'g Tr. 86:1-4.

converted the Motion to Dismiss to a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 12(d).[2]  Motion to Dismiss Hr'g Tr. 85:12-87:4, May 22, 2013 [Docket Entry # 84] ("Hr'g Tr.").

In addition to Defendants' Motion to Dismiss, the USPTO, as an intervenor ("Intervenor"), filed a Motion for Judgment on the Pleadings or Partial Summary Judgment on its Fair Use Defense and Counterclaim [Docket Entry # 60] (hereinafter "Intervenor Motion"). Plaintiffs filed a Motion to Dismiss the Counterclaim of the Intervening Defendant [Docket Entry # 75], which the Court dismissed as moot pursuant to its oral ruling in favor of Defendants' Motion to Dismiss . Hr'g Tr. 87:25-88:4.

The Court is satisfied that the limited discovery undertaken is sufficient to resolve this matter on summary judgment. Defendants utilize NPL as part of their patent prosecution legal practice. Defendants copy NPL during the preparation of Information Disclosure Statements ("IDS"), which are attached to patent applications submitted to the USPTO. *See Intervenor Br.* at 5-6; Hr'g Tr. at 19 and 31*; Defs.' App.* 103-120, Defendants Winstead PC's and John Does Nos. 1-10's Answers to Plaintiffs' Interrogatories. IDS are not mandatory, but to speed up the process, patent applicants are encouraged to submit IDS with their applications. 37 C.F.R. § 1.51(d). Nevertheless, a duty to disclose "all information known to that individual to be material to patentability" is imposed on all applicants and their agents, and IDS are a key mechanism for ensuring that this obligation is met. 37 C.F.R. § 1.56. When NPL materials are referenced in IDS,

---

[2] Rule 12(d) requires the Court to treat a motion under 12(b)(6) or 12(c) as one for summary judgment under Rule 56 if matters outside of the pleadings are present to and not excluded by the Court. When the Court makes such a conversion, all parties must be given a reasonable opportunity to present all pertinent material. The Court finds that all parties were given such a reasonable opportunity in this case.

the applicant is required to provide a copy of the publication or the portion which caused the publication to be listed. 37 C.F.R. § 1.98(a)(2)(ii).

In order to determine which prior art is material to the issue of patentability, patent applicants and their attorneys must review and analyze relevant prior art, including other patents and NPL publications. Several types of NPL copies are routinely created during the patent application process: (a) copies sent to Defendants by clients; (b) copies made for attachment to submissions to the USPTO; (c) archival copies of IDS and other USPTO submissions containing submitted NPL, maintained to memorialize their submission to the USPTO; and, (d) copies that were part of USPTO filings and correspondence which were sent to clients. *Defs.' Supp. App.* at 192-93. In addition to these four types of copies routinely produced, Defendants allegedly made more copies of some NPL for client files—copies other than the single copy used to memorialize USPTO submissions—and attached electronic copies of NPL to internal firm emails. *Id.* Copies submitted directly to the USPTO and those retained as archival documents memorializing USPTO submissions are no longer at issue in this litigation. *Pls.' Am. Compl.* at ¶ 1.

In support of their claims, Plaintiffs argue that Defendants made excessive copies of three of the thirteen articles. With regard to the three articles in question, Plaintiffs claim to be able to prove that Winstead made at least 28 copies of article No. 2 (the "Li article")[3], 38 copies of article

---

[3] The Parties dispute what constitutes a discrete copy and cannot agree as to how many copies Defendants made. Although Plaintiffs claim that Defendants made 28 copies of the Li Article, Defendants identified and admit to far fewer. Defendants identified two copies of the article submitted with U.S. Patent Applications 12/708,422 and 12/871,188, which have been kept by Winstead with the patent application hard-copies; one copy within a privileged external email sent to a Winstead attorney by another person; one internal PDF scan made by a Winstead attorney for attachment to IDS to be filed with the USPTO; seven internal Winstead emails containing IDS (with the article attached) associated with six different patent applications to be submitted to the USPTO; one PDF saved on Winstead's Docs Open electronic file management system of as filed documents for IDS associated with one patent which included the article, which was saved as three copies; one PDF scan of article saved by staff on Winstead's Docs Open electronic file

No. 7 (the "Yuzvinsky article")[4], and 4 copies of article No. 11 (the "Wong article")[5]. *Defs.' Supp.*

*App.* at 190-209; *Pls.' App.* at 14-24. Winstead has denied having made copies of any of the other

ten articles and Plaintiffs have produced no evidence to the contrary.[6] Therefore, the Court is

focused on the three articles (Li, Yuzvinsky and Wong) that Winstead admits to copying. In

calculating the number of existing copies, Plaintiffs have counted each email sent to multiple

people as one copy per recipient.

The evidence before the Court reveals that of the thirteen NPL articles identified in

Plaintiffs' Amended Complaint, there are twelve examples of copies received from clients or

---

management system; one email sent to two foreign counsel prosecuting a foreign counterpart patent application containing references cited within IDS, with the article attached. *Defs.' Supp. App.* at 200-01.

[4] Defendants admit to and identify fewer than the alleged 38 copies. Defendants identified one copy, not made by Winstead, on a CD in the patent application hard-copy client file; one internal PDF scan made by a Winstead legal assistant along with foreign patent office materials contained within a copy of a prosecution submission; one email from a Winstead legal assistant to three client contacts, a Winstead attorney and a Winstead in-firm patent agent, forwarding a USPTO non-final office action on a patent as to which the article was included as an attachment; four emails forwarding the previous e-mail; one email from a Winstead in-firm patent agent to three clients and a Winstead attorney containing a draft submission to the USPTO to which the article was attached. *Defs.' Supp. App.* at 204-06.

[5] Defendants identified one privileged email sent to two Winstead staff members with a copy, not made by Winstead, of the article attached, and one email sent from a Winstead legal assistant to a Winstead file clerk transmitting an IDS to be filed with the USPTO, which included a copy of the article. *Defs.' Supp. App.* at 208.

[6] *Defs.' Supp. App.* at 199 (denying paper or electronic copies of Article 1), 202 (identifying only one copy of Article 3, not made by Winstead, on a CD in a patent application hard-copy client file; identifying one copy of Article 4, not made by Winstead, on a CD in a patent application hard-copy client file and a paper copy attached to IDS submitted to the USPTO; identifying one copy of Article 5, not made by Winstead, on a CD in a patent application hard-copy client file, 203 (identifying one copy of Article 6, not made by Winstead, on a CD in a patent application hard-copy client file), 206 (identifying one copy of Article 8, not made by Winstead, on a CD in a patent application hard-copy client file), 207 (identifying one copy of Article 9 and one copy of Article 10, neither made by Winstead, on CDs in a patent application hard-copy client files), 208 (identifying one copy of Article 12, not made by Winstead, on a CD in a patent application hard-copy client file), 209 (identifying one copy of Article 12, not made by Winstead, on a CD in a patent application hard-copy client file).

external sources, two examples of copies made by Winstead for attachment to USPTO submissions, fourteen examples of archival copies of IDS submissions containing NPL, and three examples of copies that were part of USPTO filings and correspondence that were forwarded to clients. *Defs.' Supp. App.* at 200-209. There were also two copies of NPL in client files that went beyond the one copy Plaintiffs concede are appropriate for memorialization purposes, and several copies of later-forwarded emails that contained NPL attachments. *Id*. Defendants admit that they place hard copies of NPL in the physical client file for the patent applications. *Id*. Electronic NPL copies are not saved on individual hard drives, but are instead placed in client files, and in one case, saved under a client's file number on Defendants' electronic data management system. *Id*. at 194. Defendants presented evidence that they do not maintain a library of NPL material for internal research or circulation among firm employees. *Id*.

Defendants charge clients $0.18 for photocopies, but claim no profit for the service. *Id*. at 195. Clients are not charged for scanned copies. *Id*. at 196. Attorneys working for Winstead have discretion not to seek reimbursement for photocopies from clients; for clients whose patent work included articles 9–13 referenced in Plaintiffs' Amended Complaint, the client's contract with Winstead expressly provided that the client would not be charged for photocopies. *Id*. at 195-96. Defendants could not conclusively determine that any clients were charged for photocopies for any of the thirteen articles in the Amended Complaint. *Id*. They urge that because billing records do not specify the articles for which Winstead has sought any reimbursement for photocopying charges, discovery could not produce information relevant to this inquiry.

The issue before the Court is whether a reasonable trier of fact could find against Defendants' affirmative defense of fair use, or if Defendants are entitled to judgment as a matter of law.[7]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the facts and law, as reflected in the pleadings, affidavits and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 817, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 251 (1986). "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Insur. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (internal citation omitted). When, as in this case, the movant bears the burden of proof on an issue, the movant must "establish beyond peradventure all of the essential elements of the claim" to warrant judgment in its favor. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If movant carriers its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

---

[7] Plaintiffs, represented by the same counsel, William Dunnegan, were the lead plaintiffs (and the USPTO was an intervenor) in a nearly identical fair use case in the U.S. District Court for the District of Minnesota, *American Institute of Physics, John Wiley & Sons, Inc. and Wiley Periodicals, Inc. v. Schwegman, Lundberg & Woessner, P.A., and John Doe Nos. 1-10*, No.: 12-CV-528 RHK/JJK (D. Minn.) In that case, Judge Richard H. Kyle granted summary judgment for the defendants on August 30, 2013 [Dkt. Entry #255], adopting the Report and Recommendation ("Report") of Magistrate Judge Jeffrey J. Keyes [Dkt. Entry #250] which concluded that "all four fair use factors weigh in favor of finding that Schwegman's use in this matter is fair as a matter of law." Report at 40.

The nonmovant is then required to go beyond the pleadings and designate specific facts that prove the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625. In the absence of proof, a court will not conclude that the nonmoving party could prove the required facts. *Id*. A district court properly grants summary judgment if, when viewing the facts in the light most favorable to the nonmovant, the movant shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

### III. FAIR USE DEFENSE

"To establish copyright infringement, a plaintiff must prove ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *Eng'g Dynamics, Inc. v Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1999)). Defendants contest neither element, but invoke the fair use doctrine.

The fair use doctrine provides an affirmative defense for activity that would otherwise be deemed infringement, with the purpose to prevent copyright law from stifling the "very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (quoting *Stewart v. Abend*, 495 U.S. 201, 236 (1990)). The nonexclusive list of factors codified in 17 U.S.C. § 107 to determine whether a particular case is fair use include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Fair use analysis "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. "Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Id*. at 578.

## A. Purpose and Character of the Use

The first factor listed in 17 U.S.C. § 107 is "the purpose and character of the use." Courts consider the degree to which the new work is transformative, whether its use was commercial, and the work's potential public benefit. *See id*.; *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992). The preamble paragraph of § 107 outlines types of uses which would not constitute copyright infringement under the fair use doctrine, including "reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research". After reviewing the record, the Court finds that this factor supports Defendants' fair use defense.

### 1. Transformative Nature of Defendants' Copies

The key question under the first prong is whether the infringer's product "merely supersedes the object of the original creation" or adds "something new [to the original]." *Campbell*, 510 U.S. at 579 (internal quotations omitted). The more "transformative" the copy, the more likely it is to fall under fair use. *See id*.

Plaintiffs argue that Defendants' use of NPL copies is not transformative because Defendants make exact copies of the articles to research a scientific issue, and readers who

purchases licenses to Plaintiffs' original publications use the articles in the same manner. The Court disagrees. Defendants' copying of NPL does not "supersede" the use of Plaintiffs' original works, but has the different purpose of providing a background context for patent examiners in their analysis of patent applications. *Id.* at 579. The USPTO encourages—and sometimes requires—firms to analyze and submit NPL in order to establish a background against which a final determination on a pending patent can be made.[8] Defendants analyze the articles to determine if they are relevant to the invention they seek to patent for their client. In this sense, Defendants read the articles not to learn the scientific material contained therein, but to identify whether the article discusses scientific information related to the client's potential patent. Because the USPTO requires applicants to submit all prior art, including publications, it is not merely the content of the NPL article that matters, but its existence in the available literature.

In its briefing, the USPTO analogized the issue to hearsay. While the original publication of NPL is typically made for the "truth" of the matter, Defendants' later copying and eventual submission of NPL is not about the truth of the matter asserted therein, "but to memorialize that, at the time of the publication, the material therein, true or not, had been disclose[d] to provide the background for the alleged invention." *Intervenor Br.* at 12. Copies made for such eventual submission to the USPTO are transformative, to establish the state of the industry at a particular point in time. Copies of materials submitted to the USPTO, which may include NPL as attachments, are part of a quasi-judicial process, and the use of the NPL is transformative as evidence supporting a quasi-judicial decision. The original function of NPL articles is to provide scientists, researchers, teachers, students, and other interested persons information to keep abreast

---

[8] The relevant regulation, 37 C.F.R. § 1.56(a), requires the disclosure of all NPL that might be "material to patentability."

of current developments in a particular field; the copyrightable, expressive content is paramount to the task of aiding readers to understand the facts and ideas expressed therein. However, once a reader seeks to patent an invention, the reader must present copies to the USPTO informing it of the state of industry at the time of the application, and the purpose of such is to prove the non-copyrightable ideas, procedures, processes, systems, methods of operation, concepts, principles or discoveries extant in the field. *See* 17 U.S.C. § 102(b). At this point, the NPL is transformed from an item of expressive content to evidence of the facts within it; the expressive content becomes merely incidental. Because the USPTO requires proof of the article itself, that the expressive copyrightable contents are produced is an unavoidable consequence.

Defendants' copies are thus transformative within the meaning of the first prong of § 107(1), despite the fact that they are exact copies. Other courts have also found that exact copies of copyrighted work can be transformative in certain contexts. *See A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 638 (4th Cir. 2009) (holding that a use can be transformative in function or purpose without altering or actually adding to the original work); s*ee also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (ruling that the use of unaltered images in a search index was "highly transformative" because the copied images served the new purpose of creating an electronic reference tool, which provided a public benefit).

Plaintiffs admit in their Amended Complaint that copies made for transmission to the USPTO and copies made to memorialize USPTO transmissions fall under fair use. *Pls.' Am. Compl.* ¶ 14, 21. In the context of a copyright infringement claim, copies made to transmit to the USPTO and copies made to memorialize such transmissions are largely indistinguishable from those copies that remain the subject of the Amended Complaint, such as copies made for attorneys to allow Defendants to determine whether a particular NPL article must be submitted to the

USPTO and copies forwarded to clients as attachments to USPTO filings and correspondence. As patent applicants and their agents have the obligation to review all documents submitted to the USPTO, there can be no real distinction between a copy made for purposes of deciding whether to submit the article to the USPTO and the copy actually submitted. Similarly, if articles submitted to the USPTO are attached to USPTO filings and correspondence, subsequent copies of the USPTO writings sent to clients are indistinguishable from the USPTO's copies. Under Plaintiffs' theory, *any* unlicensed, exact copy should be considered non-transformative and thus subject to suit, notwithstanding its submission to the USPTO. Accepting that copies that are functionally identical to those copies alleged as infringement are subject to fair use, Plaintiffs do not explain why the challenged uses are not also subject to the fair use defense.

### 2. Defendants' Copying is Not a Commercial Enterprise

The second factor, specifically laid out in the text of §107(1), requires the Court to consider whether "such use is of a commercial nature or is for nonprofit education purposes." "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985).

Plaintiffs argue that Defendants' copying of NPL is a commercial enterprise. The Court disagrees. Plaintiffs argue that by charging clients $0.18 for copies, Winstead is realizing a profit. In support of its theory of profit making, Plaintiffs have produced affidavits attesting that other commercial copy centers in the Dallas area charge only $0.10 per copy. This argument purportedly seeks to bring Defendants' conduct within that deemed to be infringement in *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996), where the fair use defense failed because copies were made "on a profit-making basis by a commercial enterprise." *Id*. at 1389.

The facts in this case are distinguishable from *Princeton*. In *Princeton*, a publishing company sued a university print shop for copyright infringement for selling to students, without paying a fee to the copyright owners, coursepacks containing articles. *Id.* at 1383. The Sixth Circuit, en banc, found that although the students' use of the copies was noncommercial, the copy shop used the copies for sale in the course of their for-profit business. *Id.* at 1386. Here, the evidence is that Defendants realize no profit on photocopies. Although they may charge clients to recoup copying costs, there is no evidence to suggest that any client was in fact charged for the copying of any of the articles in question, but even if they were, the evidence is that the amount reasonably reflected the firm's actual costs of making the copy. *See Defs.' App.* at 107, Defendants Winstead PC's and John Does Nos. 1-10's Answers to Plaintiffs' Interrogatory No. 4. That companies with the primary business of copying can produce copies at a cheaper price, while still making a profit, is not relevant to whether the law firm made a profit on copies or whether the subject copies were billed for.

Plaintiffs next argue that Defendants commercially benefit from copying NPL by charging clients an hourly rate to read and analyze the articles. The Court disagrees that the copy provides a commercial benefit in this regard. The relevant inquiry is whether the Defendants receive any commercial gain from making the copy itself. Plaintiffs admit that copies of their articles are available for free in libraries. Hr'g Tr. 72:25-73:15. Because other sources of the article are available for free, the time spent by Defendants in reading the article cannot be a commercial benefit from making a copy of the article. Plaintiffs argue that under *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), it is appropriate to consider the money made from reading unauthorized copies. In that case, Texaco's fair use defense failed because it circulated copyrighted articles to staff researchers and maintained a library of copyrighted works for internal

use. *See id*. The Court finds *Texaco* inapposite. Unlike *Texaco*, Defendants do not maintain a library of copyrighted works or save copies of NPL to individual hard drives, but instead isolate NPL to individual client files, and keep NPL photocopies or digital copies solely in client files. There is no way to search for previously used NPL in Winstead's computer network, nor is there a physical library of NPL articles. Also, the *Texaco* court rested much of its reasoning on Texaco's failure to make transformative use of the articles, noting that "circulating journals among employed scientists . . . serv[ed] the same purpose for which additional subscriptions are normally sold." *Texaco*, 60 F.3d 913 at 925. Here, the use of NPL to inform patent examiners of relevant prior art is not the purpose for which additional subscriptions are normally sold. The Court finds *Texaco* inapplicable here, where the monetary gain received by the Defendants for reading an article is generated from the use of the attorneys' own time and not the content of the article itself.

Although Defendants realize profits from their larger patent work, for-profit activities loosely connected to the alleged copyright infringement are not necessarily enough to void the fair use defense. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (holding that a commercial use must involve more than simple publication in a profit-making venture for it to weigh heavily against a finding of fair use); *see also Bouchat v. Baltimore Ravens L.P.*, 619 F.3d 301, 314 (4th Cir. 2010) (holding that when a defendant gains no direct commercial advantage from its use of the copies, the first factor weights in favor of fair use). Though there is a relationship between Defendants' copying of NPL and their profits, the connection between commercial gain and the infringement is too remote to weigh heavily against a fair use defense. *See Penelope v. Brown*, 792 F. Supp. 132, 137 (D. Mass. 1992) (holding that the first factor weighs in favor of a fair use defense when defendant stood to profit from the sale of a book containing copyrighted material, but did not profit directly from the copied work). The issue is whether the copying itself

is part of a commercial enterprise. 17 U.S.C. § 106(1). There is no question that Defendants'

business is for-profit, but copying NPL is not itself a commercial enterprise because Defendants

do not profit, directly or indirectly, from making copies of the articles. Copies are used for a

singular purpose and are not put into an internal firm library or used to promote business for the

firm. *See Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 642 (S.D. Tex. 2007) (finding

unauthorized use of photograph on website to promote business to be a commercial use).

Even if Defendants' use of Plaintiffs' works did occur in a commercial context, that fact is

not determinative. *See Campbell*, 510 U.S. at 584 (holding that commerciality does not

automatically count against a fair use defense, since such a presumption would "swallow nearly

all of the illustrative uses" listed in § 107); *see also Triangle Publ'ns, Inc. v. Knight-Ridder

Newspapers, Inc.*, 626 F.2d 1171, 1175 (5th Cir. 1980) (holding that the commercial character of

an activity is not a dispositive bar to the fair use defense). Though commercial uses generally

militate against fair use, all four factors under § 107 must be weighed with each of the others in

mind. *See Campbell,* 510 U.S. at 578. In this case, the transformative nature of Defendants' use

decreases the significance of the commercialism inquiry. *Campbell*, 510 U.S. at 579 ("The more

transformative the new works, the less will be the significance of other factors, like

commercialism, that may weigh against a finding of fair use"). The commercialism inquiry does

not disfavor Defendants' fair use defense.

### 3. Public Benefit of Defendants' Copying

Because "commercial use and fair use can coexist, 'the court may consider whether the

alleged infringing use was primarily for public benefit or for private commercial gain.'" *Straus*,

484 F. Supp. 2d at 643 (citing *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir.1981)). *See also Sega*,

977 F.2d at 1523, *cited with approval in Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th

Cir. 1998) (charging courts to "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially."). Benefits to the public usually involve the "development of art, science, and industry." *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966).

Defendants' copying of NPL contributes to an efficient patent system, in that it helps the USPTO establish a context for specific patent applications within their industry. This assists patent examiners in more efficiently measuring the "novelty and non-obviousness of the alleged invention." *Intervenor Br.* at 13. The factual record demonstrates that Defendants' copying of NPL serves an evidentiary function, by alerting the USPTO to relevant prior art, and facilitates an efficient patent process, which in turn helps in the development of the arts. Though an evidentiary function does not always lead to a fair use finding, courts have found an evidentiary function to weigh in favor of a fair use defense. *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (finding fair use when newspaper published copies of controversial photographs because the copies were necessary to explain the reason for their newsworthiness); *but see Iowa State Univ. Research Found. v. American Broad. Cos., Inc.*, 621 F.2d 57 (2d. 1980) (rejecting argument that broadcasting a documentary about an Olympic wrestler produced by college students and university provided a public benefit by sharing life history of public figure and distinguishing factual content from the expression of factual content). The Court finds that the evidentiary function does lead to a fair use finding here, because to require patent attorneys like Defendants to purchase licenses for every copy of an article they are obligated to review and submit to the USPTO would stifle the duty of candor by discouraging patent applicants and their counsel from thoroughly reviewing the scope of relevant publications, thereby slowing down the patent application process and potentially resulting in erroneous patentability decisions. The fact that

patents confer commercial benefits does not lessen the benefits to the public from having a robust patent system. "[N]ews reporting, comment, criticism, teaching, scholarship, and research, . . . 'are generally conducted for profit in this country'", yet they are still afforded particular protections to the extent they provide public benefit. *Campbell*, 510 U.S. at 584 (citing *Harper & Row*, 471 U.S. at 592 (Brennan, J., dissenting)). In conclusion, Defendants' transformative use of NPL copies, the largely non-commercial nature of the activity, and the public benefit derived from Defendants' activities all weigh strongly in favor of a fair use defense under the first factor of §107.

### B. Nature of the Copyrighted Work

The second factor for a fair use analysis considers the "nature of the copyrighted work." 17 U.S.C. § 107(2). "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper &*, 471 U.S. at 563. In contrast, fictional works or works containing creative expression are less likely to fall under the fair use defense. *See Stewart v. Abend*, 495 U.S. 207 (1990). Defendants argue that NPL primarily communicates factual and scientific information, and therefore is subject to less protection than expressive works, such as poems, songs or fictional works. *Defs.' Br.* at 4. The Court agrees. Although NPL do contain protectable, expressive content, they are certainly more factual than a newly created work such as a poem or story. The second factor weighs in favor of a finding of fair use.

### C. Amount and Substantiality of Portion Used

The third factor of fair use analysis considers "…the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Defendants copy NPL in their entirety; therefore, this factor weighs against Defendants' fair use defense, though not substantially.

The "extent of the permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. Here, Defendants make full copies of NPL. Defendants argue complete copies are necessary to satisfy their obligation to provide material research to the USPTO, while Plaintiffs contend that there is a question of material fact as to whether USPTO regulations require full articles or only portions of articles. Notwithstanding Defendants' obligation to the USPTO, the Court finds no factual dispute that Defendants' use of complete NPL copies militates against a finding of fair use.

Though Defendants may or may not *need* to use full articles in certain circumstances, the USPTO's requirements under 37 C.F.R. § 1.56 are relevant only to the extent they mitigate the weight of the third factor against a fair use defense. Patent attorneys face potential liability if they fail to submit relevant information as required by the USPTO. 37 C.F.R. § 1.56. The threat of liability encourages patent attorneys to be both generous in what articles they deem relevant and favorable towards submissions of full articles in lieu of excerpts that may or may not convey the full scope of the material information. Though there is no question that Defendants' use of full copies weighs against a fair use defense, controlling precedent allows for countervailing considerations when the purpose of Defendants' copying is connected to lawyers' ethical requirements under 37 C.F.R. § 1.56. *See Campbell*, 510 U.S. at 586 (holding that an acceptable purpose for secondary copies could impact the extent of copying deemed permissible); *see also Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50 (1983) (holding that the acceptable purpose of making personal videotapes of television programs pushed against the typical, negative effect of making complete reproductions of copyrighted works). The negative weight of this third factor is further tempered because Defendants' copies of NPL are transformative. *See A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 642 (4th Cir. 2009)

(affirming that it was proper for a district court to consider defendant's transformative use of new works under both the first and third fair use factors). Thus, the third factor is neutral or weighs only slightly against a finding of fair use.

### D. Effect on the Potential Market

The fourth factor measures "the effect of the use upon the market for, or value of, the copyrighted work." 17 U.S.C. § 107(4). Here, this factor weighs in favor of Defendants' fair use defense.

The fourth factor represents the most important aspect of fair use. *Harper & Row*, 471 U.S. at 566; *Triangle Publ'ns*, 626 F.2d at 1177. At the heart of the fair use inquiry is "whether, under the circumstances, it is reasonable to expect the user to bargain with the copyright owner for use of the work." *Sony* 464 U.S. 417 at 479 (Blackmun, J., dissenting). Courts must consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotations omitted). An adverse market effect alone does not preclude a fair use defense; instead, the focus is whether a defendant's secondary use "usurps the market of the original work," not whether the secondary use "suppresses or even destroys the market for the original work." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 642 (4th Cir. 2009) (quoting *NXIVM Corp. v. The Ross Institute*, 364 F.3d 471, 482 (2d Cir. 2004)).

Defendants meet their initial burden to establish an affirmative defense under factor four when they present evidence that their actions have no significant impact on the market for Plaintiffs' original articles. Defendants note that most of the NPL articles at issue here were published years before Defendants' use and thus have a diminished commercial value. *Defs.' Mot.*

*to Dismiss Original Compl.* at 13 [Docket Entry #13] (citing USPTO Position on Fair Use of Copies of NPL Made in Patent Examination, Bernard J. Knight, Jr., General Counsel (Jan. 19, 2012)). Further, Defendants' NPL copies are not distributed outside of attorneys and their support staff actively pursuing specific patent applications and their patent application clients; access by the public is strictly limited by attorney confidentiality requirements. *Id*. at 19. However, Plaintiffs argue that any infringement of NPL articles deprives them of licensing fees and that licensed copies are easily accessible through the Copyright Clearance Center, Inc. ("CCC") or through Plaintiffs' websites. Hr'g Tr. 72:5- 24.

Plaintiffs' argument fails to raise a question of material fact that would prevent this Court from concluding that the fourth factor weighs in favor of a fair use defense. First, the factual record does not show that the market for Plaintiffs' copyrighted works is affected by Defendants' actions, and Plaintiffs could have presented that evidence had they wished to do so. "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder." *Texaco*, 60 F.3d at 930 n.17. Precious few copies that might be construed as infringing could be identified in Defendants' files, and speculative claims about multiple copies created via digital communications among Defendants' employees are unsupported by factual evidence, but are nevertheless a very small number. Further discovery in this area is unnecessary, as Defendants have presented sworn evidence that it would be impossible to accurately identify the number of digital copies made because multiple email systems have been used over a period of several years, each with a different method of transmitting information. *Defs.' Reply Br.* at 6 [Docket Entry #73]. Even considering

the effect of Defendants' actions in the aggregate, it is clear on these facts that the NPL copies do not "usurp" the market for Plaintiffs' works.

Defendants further benefit from *Campbell*, which precludes an inference of market harm in cases that go "beyond mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591. When, as here, Defendants' subsequent use of the original work is transformative, "market substitution is at least less certain, and market harm may not be so readily inferred." *Id.; see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1274 n. 28 (11th Cir. 2001) ("Whereas a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original, a transformative work is less likely to do so.") (internal quotation marks omitted); *Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001) ("The market effect must be evaluated in light of whether the secondary use is transformative"). Because Defendants' use of NPL is transformative, precedent instructs this Court against inferring a negative market effect.

The determinative issue, however, is the public benefit associated with Defendants' use of NPL copies. Even construing the facts in the light most favorable to Plaintiffs—including proof of the availability of the Kong and Li articles[9] and the potential aggregate effect of Defendants' actions—no trier of fact could find that the public benefit fails to outweigh Plaintiffs' potential

---

[9] Plaintiffs provide no evidence that eleven of the thirteen articles cited in their Amended Complaint were available as licensed copies. Though Plaintiffs provided evidence in their Original Complaint that the "Kong" and "Li" articles were available on AIP's website and the Wiley Online Library, respectively, no evidence of similar availability for the other eleven articles was presented. While this Court will construe factual controversies in the light most favorable to Plaintiffs under the summary judgment standard, in the absence of proof, it cannot conclude that the nonmoving party could prove the required facts. *Lynch*, 140 F.3d at 625. Since it is "more sensible that a particular unauthorized use [is] 'more fair' when there is no ready market or means to pay for the use," Defendants benefit under the fourth factor when Plaintiffs present no evidence, as they clearly could were it true, that these eleven articles were easily available for licensed use. *See Texaco*, 60 F.3d at 931.

benefit as copyright owners under the facts of this case. Defendants' copying minimizes excessive costs in patent applications and maximizes the accuracy of the patent process, while Plaintiffs' potential gain would be limited to profits on a limited number of new licenses.

Thus, on balance, the fourth factor weighs in favor of a fair use defense.

### E. Plaintiffs' Supplemental Arguments Do Not Support Finding of Infringement

In supplemental briefing filed after this Court's oral ruling in Defendants' favor, Plaintiffs made two additional arguments based on a broad interpretation of *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985). *Pls.' Supp. Br.* at 3-5 [Docket Entry #89]. First, Plaintiffs argue that as a prerequisite to invoking the fair use defense, a defendant must have an authorized first copy of the copyrighted work. *Id.* at 3. In support of this assertion, Plaintiffs point to language in *Harper & Row* requiring "good faith and fair dealing" and distinguishing between for-profit and scholarly pursuits. 471 U.S. at 562-63. Plaintiffs also point to *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992), which states that "[t]o invoke the fair use exception, an individual must possess an authorized copy of a literary work" and to *DSC Comms. Corp. v. DGI Techs., Inc.*, 898 F. Supp. 1183, 1192-93 (N.D. Tex. 1995), *aff'd*, 81 F.3d 597 (5th Cir. 1996). These cases are distinguishable. In *Harper & Row*, *Atari*, and *DSC*, the original copies were obtained in improper ways for known impermissible purposes. In *Harper & Row*, Ford's memoirs were leaked and The Nation Magazine usurped Time Magazine's opportunity to be the first to publish; the case did not turn on the fact that the copy was allegedly obtained improperly, but rather on the fact that The Nation Magazine stole the entire potential market for Time Magazine's materials. 471 U.S. 541. In *Atari*, the source code at issue was obtained through misrepresentations to the Copyright Office. 975 F.2d at 843 ("Because Atari was not in authorized possession of the Copyright Office copy of 10NES, any copying or derivative

copying of 10NES source code from the Copyright Office does not qualify as a fair use."). Finally, in *DSC*, the copyrighted materials were obtained in knowing violation of the end user license agreement. 898 F. Supp. at 1194. The cases cited by Plaintiffs do not stand for the proposition that the acquisition of the original work must be in "good faith," but in any case, the evidence here does not show bad faith anyway. Instead, the courts weighed the equities in each case, and when a party obtained the relevant material through a breach of confidence or deception, the balance of equities changed. Here, the Li article was neither confidential nor unpublished, and its submission to the USPTO was required as a matter of law. Additionally, Winstead received copies it believed to be legitimate, particularly from its clients, and used them for purposes that did not interfere with the rights of the copyright holders to otherwise exercise exclusive control over their materials, i.e., Winstead did not usurp the market for the articles.

Next, Plaintiffs argue that under *Harper & Row*, fair use only applies where its application would foster creative expression and not in any other situation, no matter how socially desirable. *Pls.' Supp. Br.* at 5-6, 9. The Court disagrees with this sweeping conclusion. Indeed, the Supreme Court rejected the idea that fair use only be imposed "whenever the social value [of dissemination] . . . outweighs any detriment to the artists." 471 U.S. at 559. Similarly, the Second Circuit held that "the fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa State Univ. Research Found., Inc. v. Am. Broad. Companies, Inc.,* 621 F.2d 57, 61 (2d Cir. 1980). Yet those courts did not conclude that fair use is appropriate *only* when fostering creative expression. Instead, the courts balanced the equities in each case, while holding that the mere finding of *some* social value was not alone sufficient. Furthermore, even if the Court were to accept Plaintiffs' broad reading of the cases, the collective holdings do not support Plaintiffs' cursory

conclusion that "the purported duty of candor to a patent office does not justify . . . unauthorized copying." *Pls.' Supp. Br.* at 7. Defendants' use of the materials arguably fostered creative expression in the fields of engineering and medicine, and more importantly, Defendants' argument and the evidence are not based on the contention that only a marginal social value establishes the fair use defense.

### F. Weight of Factors Supports Finding of Fair Use

Three of the four fair use factors clearly favor Defendants—the purpose and character of the use, the nature of the work, and the effect of the use on the potential market. The factor that does not favor fair use—the amount and substantiality copied—does not carry the same weight. Here, Defendants makes transformative, non-commercial use of copyrighted work in a way that promotes the public interest; this use is entitled to the fair use defense. For the foregoing reasons, Defendants are entitled to summary judgment on their affirmative defense stemming from alleged copyright infringement, and to that extent, the Motion for Summary Judgment is **GRANTED.**

## IV. COPIES SENT TO FOREIGN ATTORNEYS PROSECUTING CORRESPONDING FOREIGN PATENTS

At the hearing, the Court withheld judgment on copies made for and sent to foreign attorneys prosecuting patent applications in foreign jurisdictions. Plaintiffs assert a claim for infringement of the Li article, which was sent in a single email by a Winstead attorney, Samuel Udovich, to Canadian patent attorneys at Ridout and Maybee, LLP to assist in the filing and prosecution of a Canadian counterpart patent for their client. *See Dec. of Samuel A. Udovich* at ¶ 7. The Li article was attached to the IDS disclosure made to the USPTO regarding the patent being pursued in Canada and the U.S. patent examiner had noted that he had expressly considered the Li article. *Id.* Although the Canadian Intellectual Property Office ("CIPO") never requested a copy

of the article, the Canadian patent attorneys submitted it to aid the issuance of the Canadian patent. *See Dec. of Samuel A. Udovich* at ¶ 7. At the time of the hearing, the parties were unable to inform the Court which foreign jurisdiction(s) were at issue and thus the Court was unable to determine if these foreign patent procedures were substantially similar to those employed by the United States. The Court did state, however, that in the absence of some difference between the two systems, the Court would likely apply the same finding of fair use to the foreign application copies.

Defendants filed a sur-reply [Dkt. Entry #85] identifying Canada as the foreign jurisdiction in question and presented evidence that Canadian patent prosecutions are significantly similar to those adopted by the USPTO. Plaintiffs did not object to the Defendants' characterizations of Canadian patent law. Accordingly, the Court takes judicial notice of patent law and procedures before the CIPO pursuant to Federal Rule of Civil Procedure 44.1 and Federal Rule of Evidence 201. After reviewing these procedures, the Court finds that Canada, like the United States, imposes a duty of candor on all patent applications. *Pason Systems Corp. v. Canada (Commissioner of Patents)*, (2006 FC 753) (Hughes, J.) (holding that applicants and their agents "owe a duty of cand[or] to the Patent Office to make a full, fair and frank disclosure of all the relevant circumstances . . . [and] disclosure of an obviously relevant matter such as ongoing litigation is a clear obligation."). The Court finds that CIPO procedures encourage applicants to submit all prior art and materials, including publications, which are material to patentability. *See* CIPO's Manual of Patent Office Practice Section 13.04. ("The object of the voluntary submission of prior art is to expedite prosecution by bringing the attention of the examiner to documents that might otherwise not be immediately identified at the outside of the examination."). Further, the CIPO may require applicants to provide prior art submitted as part of a patent application in another country. *Id*. As the obligations on the parties are the same as those owed to the USPTO, and because the CIPO,

like the USPTO, performs quasi-judicial functions, the creation and submission of copies of NPL

articles to the CIPO constitutes fair use for the same reasons discussed above.

Defendants' Motion for Summary Judgment directed to the e-mail sent to foreign counsel

containing a copy of the Li article is **GRANTED**.

**V. CONCLUSION**

The Court concludes, for the reasons explained above, that Defendants' use of Plaintiffs'

copyrighted materials constitutes fair use. Accordingly, the Court **GRANTS** Defendants' Motion

for Summary Judgment in its entirety.  The USPTO's Motion for Partial Summary Judgment

[Docket Entry #60] is **DENIED as moot.** Plaintiffs' Motion to Dismiss the Counterclaim of the

Intervening Defendant [Docket Entry # 75] is **DENIED as moot**.

**SO ORDERED.**

December 3, 2013.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**